United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 28, 2007**

Charles R. Fulbruge III
Clerk

In the

# United States Court of Appeals
## for the Fifth Circuit

_____

m 05-11492

_____

IN THE MATTER OF:

TXNB INTERNAL CASE,

Debtor.

EDGE PETROLEUM OPERATING COMPANY, INC.,

Appellant,

VERSUS

GPR HOLDINGS, L.L.C.; AURORA NATURAL GAS, L.L.C.;
DUKE ENERGY TRADING AND MARKETING, L.L.C.;
GOLDEN PRAIRIE SUPPLY SERVICES, L.L.C.,

Appellees.

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

Before SMITH, BENAVIDES, and PRADO, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Edge Petroleum Operating Company, Inc. ("Edge"), appeals the summary judgment entered in its conversion action against Duke Energy Trading and Marketing, L.L.C. ("Duke"). We affirm.

I.

Edge, a producer of natural gas, sold gas to GPR Holdings, L.L.C. ("GPR"), Aurora Natural Gas, L.L.C. ("Aurora"), and Golden Prairie Supply Services, L.L.C. ("GPSS") (collectively "the debtors"), through its marketing agent, Upstream Energy Services Company ("Upstream"). The gas was delivered by pipeline in May and June 2001, and the debtors were obliged by contract to pay Edge on the twenty-fifth day of the month following delivery, i.e., on June 25 and July 25. The debtors sold the gas to Duke, which resold it to third parties. In the pipeline, the gas produced by Edge was commingled with gas from other producers; the gas has since been consumed.

Edge has not been paid for the gas, nor has it filed any claim against the debtors in their respective bankruptcy cases, which were filed in August 2001. Instead, Edge sued Duke in state court, seeking to recover the amount the debtors owed for the gas and damages for conversion of Edge's security interest under the Texas Mineral Lien Act.[1] Edge and the debtors allege that Duke has not paid the debtors for the gas; Duke answers that it did pay for the gas, based on the theory that it overpaid the debtors in the months before May 2001 and, to offset its overpayment, accepted delivery of gas in May and June 2001.

The debtors are suing Duke for payment for the later deliveries in separate litigation.[2] Edge contends that even if Duke overpaid for the earlier gas, the fact that it offset that payment by failing to pay for Edge's gas means that it accepted Edge's gas as payment for a debt, and it thereby abrogated any possible status as a holder in due course and subjected itself to double liability in the case of conflicting determinations by state and federal courts.[3]

Shortly before a scheduled trial in state court, Duke removed to the United States District Court for the Southern District of Texas, predicating jurisdiction on the bankruptcy of Aurion Technologies, L.L.C. ("Aurion"), which was the majority shareholder of Aurora and was controlled by a common owner, Dennis McLaughlin III.[4] Duke conceded in the district court that its removal was untimely with regard to the ongoing bankruptcy cases

---

[1] *See* TEX. BUS. & COM. CODE ANN. § 9.343, formerly *id.* § 9.319 before recodification in 2002. The text of the statute and the existence of any material difference between the codifications will be discussed below.

[2] *See GPR Holdings, L.L.C. v. Duke Energy Trading & Mktg., L.L.C.* (No. 03-3430, Bankr. N.D. Tex.).

[3] *See* TEX. BUS. & COM. CODE §§ 1.-201(9), 9.320(a).

[4] Shortly before the instant suit was filed, Duke alleged in separate state court proceedings that McLaughlin had acted through Aurora, GPR, GPSS, and Aurion to defraud it by accepting payment for gas that he never intended to deliver, through a scheme that induced Duke to pay twice the agreed-upon price for each shipment: one full payment to Aurora and one full payment to one of McLaughlin's other companies.

2

of all the debtors other than Aurion. Edge acknowledges that removal would be timely with respect to the bankruptcy of Aurion but claims that it is not seeking to enforce a lien on the proceeds from the sale of any gas that may have passed from Edge through Aurion, so this case is not related to Aurion's bankruptcy. Unlike GPR, GPSS, and Aurora, Aurion has not intervened in the instant case.

The Southern District court ruled, in response to Edge's first motion for remand, that this matter is related to the Aurion bankruptcy proceedings and thus that removal was timely. It then transferred the case to the United States District Court for the Northern District of Texas, where Edge renewed its motion for remand (either for lack of jurisdiction or abstention), which was once again denied, this time by the bankruptcy court. Edge then consented to jurisdiction in the bankruptcy court rather than the district court.

The bankruptcy court granted the debtors' motion to intervene. The debtors asserted that they are the real party in interest to Edge's lawsuit, because Edge is seeking to enforce a lien against property owned by them in the form of accounts receivable. The bankruptcy court granted summary judgment in favor of Duke and the debtors, reasoning that, even accepting, *arguendo*, that Edge possessed a valid lien, Edge sought to enforce that lien against the debtors' accounts receivable.

Hence, the bankruptcy court held that the action was automatically stayed,[5] and it declined to grant leave from the stay. The court then ruled that Texas state law did not permit Edge to enforce its possible security interest via a conversion action against Duke. The court found a disputed issue of material fact as to whether Edge had a security interest.

Edge perceived, in the bankruptcy court's opinion, a determination that Edge did, in fact, hold a security interest in the proceeds from sale of the gas, so Edge moved for amendment of the summary judgment order to reflect such a finding. The court explained that it had determined that Edge possessed a security interest in whatever proceeds were actually due to the first purchaser but that such determination did not imply summary judgment that Edge had any security interest in the proceeds of the sale currently in possession of Duke; the court declined to amend its order.

The district court affirmed the bankruptcy court without separate opinion. Edge now appeals only in regard to its conversion action to enforce its lien; in the summary judgment proceeding, Edge did not address the action to recover the purchase price of the gas.

II.

We first address subject matter jurisdiction, which is a question of law that we review *de novo*. *See McKnight v. Comm'r*, 7 F.3d 447, 450 (5th Cir. 1993). Although Edge alleges that it seeks assets from Duke solely under state law, there is federal jurisdiction because of implications for the debtors' estates.[6]

---

[5] *See* 11 U.S.C. § 362(a)(3), (4), (5) and (6) (staying, automatically upon filing of a bankruptcy petition, creditors' actions to exercise control over property of the bankruptcy estate and to collect or recover on a pre-bankruptcy petition claim).

[6] Duke asserts that Edge waived any jurisdictional objection by consenting to trial in bankruptcy court, but this argument is meritless according to the well settled doctrine that federal subject matter jurisdiction may be challenged at any time on appeal; "parties cannot waive a want of subject
(continued...)

Duke removed pursuant to 28 U.S.C. § 1452, which allows removal of claims where federal jurisdiction arises under 28 U.S.C. § 1334. Section 1334(b) provides for federal jurisdiction over proceedings "related to" cases arising under the Bankruptcy Code. We have read this jurisdictional grant broadly, stating that the test for whether a proceeding properly invokes federal "related to" jurisdiction is whether the outcome of the proceeding could conceivably affect the estate being administered in bankruptcy. *See Arnold v. Garlock, Inc.*, 278 F.3d 426, 434 (5th Cir. 2001). Certainty is unnecessary; an action is "related to" bankruptcy if the outcome could alter, positively or negatively, the debtor's rights, liabilities, options, or freedom of action or could influence the administration of the bankrupt estate. *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 752 (5th Cir. 1995).

The district court appears to have assumed that, if this case merely involved a claim by Edge against Duke's assets, there would be no federal jurisdiction.[7] The court determined, however, that Edge's rights extend only to a lien on "the identifiable proceeds of that production owned by, received by, or due to [the debtors]." *See* TEX. BUS. & COM. CODE ANN. § 9.343(c). Because the district court reasoned that any assets in Duke's possession on which Edge had a lien must at least be "due to [the debtors]," it ruled that this case relates to the bankruptcy estates and properly invokes

federal jurisdiction.

Although, as we explain, this case involves only a claim against Duke's assets, the district court was wrong to assume that a claim by Edge solely against Duke's property does not relate to the debtors' bankruptcy proceedings. Someone owes Edge money for the gas; if it is not Duke, it is the debtors. *See id.*. If it is Duke, then Duke will have discharged a liability of the debtors and, as the bankruptcy court recognized, probably will file a claim against the debtors' estates for reimbursement. Although there likely would be no change in the amount of liability claimed against the debtors, Duke and Edge presumably had different contractual arrangements with the debtors and different statutory bases for their claims.

For example, Edge holds a secured gas producer's lien, but Duke does not. *See* § 9.343(a). Because of these divers contractual and statutory frameworks, the identity of the party that the debtors owe for Edge's gas is likely to affect the administration of the debtors' estates and may alter the debtors' rights and liabilities. Under the lenient test set forth above, that possibility is sufficient to confer federal jurisdiction.

### III.

Edge urges that we order a remand to state court because Duke's removal was untimely. We disagree.

Duke contends, as it did with respect to subject matter jurisdiction, that Edge waived any objection to the timeliness of removal by consenting to bankruptcy court jurisdiction. Timeliness of removal is a procedural rather than a jurisdictional issue and, accordingly, may be waived by an untimely objection. *See Hartford Accident & Indem. Co. v. Costa Lines Cargo Servs., Inc.*, 903 F.2d 352, 359-

---

[6](...continued) matter jurisdiction." *Hospitality House, Inc. v. Gilbert*, 298 F.3d 424, 429 (5th Cir. 2002).

[7] As the bankruptcy court explained, "If Edge were only pursuing a cause of action against Duke's property, this proceeding would not be related to the Debtors' bankruptcies and there would be no basis for federal jurisdiction."

4

60 (5th Cir. 1990). Here, however, Edge's objection was timelySSit came only six days after removalSSand the fact that Edge was willing to have its case tried by the bankruptcy court rather than the district court after its objections to removal and the timeliness thereof were overruled does not serve to waive those objections.

Although removal was timely solely with respect to Aurion's bankruptcy petition, and Aurion bore an attenuated relationship to the parties, the test for "related to" bankruptcy jurisdiction is sufficiently broad to provide federal jurisdiction for this case by relating it solely to Aurion's bankruptcy. Because this litigation related to Aurion's bankruptcy petition, removal was timely.

In response to Edge's arguments concerning the timeliness of removal, the district court found that Aurion was the assignee of certain of Aurora's contractual rights arising from its sale of gas to Duke. We review this finding of fact for clear error, *see Bass v. Denney (In re Bass)*, 171 F.3d 1016, 1021 (5th Cir. 1999), and we decline to upset it on appeal. Even if Aurion is not subject to Aurora's liabilities (a matter about which we express no opinion), the outcome of this case could affect Aurion's recovery from Duke in the separate litigation involving Duke and the debtors. This litigation thus relates to Aurion's bankruptcy, and Duke's removal within ninety days of the order for relief stemming from Aurion's bankruptcy petition was timely. *See* FED. R. BANKR. P. 9027(a)(2)(A).

## IV.

Edge argues that the district court was required by the mandatory abstention provision applicable to non-core bankruptcy proceedings to abstain from adjudicating this case. *See* 28 U.S.C. § 1334(c)(2). We review the decision

not to abstain for abuse of discretion.[8] *Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 929 (5th Cir. 1999). The court did not abuse its discretion, though our conclusion is not predicated on any argument advanced by the parties or expressly relied on by the district court in its discussion of abstention.[9]

Section 1334(c)(2) reads as follows:

Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(2). We have interpreted this provision to mandate federal court abstention where "(1) [t]he claim has no independent basis for federal jurisdiction, other than § 1334(b); (2) the claim is a non-core proceed-

---

[8] Again, we stress that Edge did not waive its arguments on mandatory abstention by consenting to bankruptcy court jurisdiction. Edge waived any right it had to trial in district court rather than bankruptcy court under 28 U.S.C. § 157 but did not waive its contention that federal courts should abstain from adjudicating this case. *See FDIC v. Majestic Energy Corp. (In re Majestic Energy Corp).*, 835 F.2d 87, 90 (5th Cir. 1988).

[9] We may affirm for any reason supported by the record, even if not relied on by the district court. *LLEH, Inc. v. Wichita County, Tex.*, 289 F.3d 358, 364 (5th Cir. 2002).

ing, i.e., it is related or in a case under title 11; (3) an action has been commenced in state court; and (4) the action could be adjudicated timely in state court." *Schuster v. Mims (In re Rupp & Bowman)*, 109 F.3d 237, 239 (5th Cir. 1997). Section 1334(b) provides for federal jurisdiction over cases arising under or related to the bankruptcy code.

Edge's complaint gives rise to two claims: one that is a core proceeding and another that is supplemental to it and eligible for federal jurisdiction under 28 U.S.C. § 1367(a). Bankruptcy courts may not exercise supplemental jurisdiction. *See Walker v. Cadle Co. (In re Walker)*, 51 F.3d 562, 570 (5th Cir. 1995). Section 1334(c)(2), however, addresses abstention by district courts. Section 1367(a) provides for supplemental jurisdiction (subject to irrelevant exceptions) over claims forming part of the same case or controversy with "any civil action over which the district courts have original jurisdiction." This includes bankruptcy jurisdiction.[10] It follows that district courts have supplemental jurisdiction over claims that form part of the same case or controversy with bankruptcy claims. *See Publicker Indus. v. United States*, 980 F.2d 110, 114-15 (2d Cir. 1992).

Because neither of Edge's claims meets the criteria of the *Schuster* test, the bankruptcy and district courts were correct in refusing to abstain. When this case was removed and the district court reconsidered its jurisdiction, the court was appropriately wary of the breadth of Edge's complaint.[11] The court noted that the complaint was drafted broadly enough to provide the right to pursue a claim against the proceeds of the sale from the debtors to Duke as well as the proceeds from the sale from Duke to third parties.[12]

If Edge was not pursuing both theories, it should have sought leave to amend its complaint rather than confuse the lower courts into addressing both theories. Federal question jurisdiction must be determined from the face of a well-pleaded complaint. *See Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149, 152 (1908). The district court was correct not to remand the possible claim against the proceeds of the sale from the debtors to Duke; these would have been accounts receivable by the debtors, and claims against them would be core bankruptcy proceedings not entitled to mandatory abstention.[13]

---

[11] The court quoted the complaint's statement that "[t]his is an action for recovery of the value (contract price) of a volume of Texas gas, or proceeds thereof that Edge as the producer sold, but for which it has not been paid."

[12] *See Cohen v. Rains*, 769 S.W.2d 380, 384-85 (Tex. App.SSFort Worth 1989, writ denied) ("[W]hen a debtor is in default a secured party is not required to elect which of these rights he wishes to pursueSShe may take any permitted action or combination of actions.").

[13] *See* 28 U.S.C. § 157(b)(E) (defining "orders to turn over property of the estate" as within "core" federal bankruptcy jurisdiction); *Schuster*, 109 F.3d at 239 (stating that core matters fail prong two of the test recounted above); *Southmark*, 163 F.3d at 932 (explaining that matters within core bankruptcy jurisdiction are subject to discretionary rather than mandatory abstention). As Edge acknowledges, the district court's refusal to abstain (continued...)

---

[10] *See* § 1334(a) (stating that subject to a provision for concurrent jurisdiction in the bankruptcy courts, "the district courts shall have original and exclusive jurisdiction of all cases under title 11").

Edge also was not entitled to abstention on its claim against the proceeds of Duke's sale to third parties, because mandatory abstention applies solely to claims giving rise to federal jurisdiction under no provision other than § 1334. Edge's claim against the proceeds from Duke's sale to third parties does not meet that requirement, because it arises from "a common nucleus of operative fact" with the claim against the debtors' accounts receivable and is thus a supplemental claim giving rise to jurisdiction under § 1367(a).[14]

The fact that Edge ultimately waived the merits of its federal-question claim and pressed only its supplemental claim did not affect the propriety of abstention *vel non*, because Edge's loss on the merits of its federal question claim did not operate to defeat the district court's independent basis for jurisdiction over the supplemental claim.[15] In sum, the complaint gave rise to two claims; because Edge's non-core claim was supplemental to the core claim it could have pressed, and because § 1367(a) continued to provide an independent basis for federal jurisdiction even after Edge had waived the merits of its core bankruptcy claim, abstention was inappropriate.

## V.

Edge contests the bankruptcy court's ruling

---

[13](...continued)
as a matter of discretion pursuant to § 1334(c)(1) is unreviewable on appeal. *See* § 1334(d).

[14] *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966); *Schuster*, 109 F.3d at 239.

[15] *See* § 1367(c) (providing for discretionary abstention rather than lack of jurisdiction over supplemental claims where the claim giving rise to original jurisdiction (federal question, diversity or admiralty) has been dismissed on the merits).

that this action was automatically stayed under 11 U.S.C. § 362(a). We review the court's interpretation of the statute *de novo*. *Southmark*, 163 F.3d at 929. Section 362(a) operates to stay only actions against bankruptcy petitioners and their property. Because Edge's claim for conversion against Duke lies against a non-debtor and does not implicate the property of the debtors, the bankruptcy court erred by staying it.

Section 362(a) recounts a long list of actions that are stayed by the filing of a bankruptcy petition. The provision does not apply, however, to actions not directed against the debtor or property of the debtor. *See Arnold v. Garlock, Inc.*, 278 F.3d 426, 436 (5th Cir. 2001). The bankruptcy court determined that, should the proceeding between Duke and the debtors result in a finding that Duke had not paid the debtors for the gas, Edge's claim would be against accounts receivable by the debtors and thus would be stayed as an action against the debtors' property.

The court misinterpreted Edge's claim. Edge argues that Duke is liable to it independently of whether Duke has paid the debtors, because (1) § 9.343 provides a lien that follows the gas or proceeds from sale thereof until cut off by a sale in the ordinary course of business or payment to the lienholder; (2) Edge has not been paid for the gas; and (3) Duke did not cut off Edge's lien by transacting in the ordinary course of business.

Under this theory, Edge's rights hinge on whether the manner in which Duke transacted with the debtors immunized Duke, as a holder in due course, from liability to Edge. Though relevant, the factual matter at issue in the debtors' suit against DukeSSwhether Duke paid for the gasSSis not dispositive of the holder-in-due-course issue. Edge contends that § 9.343

imposes liability on Duke even if it paid the debtors but did not do so in the ordinary course of business and did not comply with the statutory safe harbors. Edge's claim thus lies against the proceeds of Duke's sale of the gas to third parties (the sale that, according to Edge, cut off its lien on the gas) rather than against any accounts receivable by the debtors.

It is true, as noted above in the discussion of subject matter jurisdiction, that a successful claim by Edge against Duke would probably result in a lawsuit by Duke against the debtors seeking indemnification for Duke's payment of the debtors' debt to Edge. Edge, however, has framed its claim so that the merits of that probable litigation are not Edge's problem. Regardless of whether Edge's reading of Texas law is correct, its claim is not directed against the debtors' property and is not subject to a stay under § 362(a).

## VI.
### A.
We agree with the district court that Edge has demonstrated that there is a disputed issue of material fact as to whether it has a gas producer's lien on the proceeds of Duke's sale of the gas, but that Edge may not recover from Duke *via* an action for conversion. Because the viability of a conversion action depends critically on the nature of the property allegedly converted, we address whether Edge arguably has a lien at all.

The issue of whether Edge has a gas producer's lien on the proceeds of Duke's sale of the gas raises two subsidiary questions: (1) Does Texas law, under any circumstances, provide Edge with a lien that could be enforced against the proceeds of a sale of its gas to a third party by a downstream purchaser such as Duke; and (2) assuming Texas law provides for a lien against a downstream pur-

chaser, do the facts of this case arguably support the conclusion that Edge has one against Duke? *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248-49 (1986). We discuss only whether Texas law allows for a producer's lien on gas or the proceeds from resale thereof that is enforceable against a downstream purchaser such as Duke. We do not consider whether a lien was created in Edge, because we conclude that, on the facts before us, the legal nature of the lien renders it unenforceable *via* an action for conversion.

### B.
Section 9.343 is the successor of a nonuniform addition to Texas's commercial code designed to provide security protection for royalty owners and producers when first purchasers go bankrupt.[16] The statute reads in relevant part as follows:

(a) This section provides a security interest in favor of interest owners, as secured parties, to secure the obligations of the first purchaser of oil and gas production, as debtor, to pay the purchase price. An authenticated record giving the interest owner a right under real property law operates as a security agreement created under this chapter. The act of the first purchaser in signing an agreement to purchase oil or gas

---

[16] *See* Cynthia G. Grinstead, Note, *The Effect of Texas U.C.C. Section 9.319 on Oil and Gas Secured Transactions*, 63 TEX. L. REV. 311, 311 (1984). Duke alleges that the prior codification of these sections governed at the time of the transactions at issue and that the prior codification differs in material respects. Duke concedes, however, that the former § 9.319 is identical to § 9.343; it argues instead that other referenced sections are critically different. Like the parties and courts *a quo*, we refer to the current codification and mention any changes where relevant.

production, in issuing a division order, or in making any other voluntary communication to the interest owner or any governmental agency recognizing the interest owner's right operates as an authentication of a security agreement in accordance with Section 9.203(b) for purposes of this chapter.

(b) The security interest provided by this section is perfected automatically without the filing of a financing statement. . . .

(c) The security interest exists in oil and gas production, and also in the identifiable proceeds of that production owned by, received by, or due to the first purchaser:

(1) for an unlimited time if:

(A) the proceeds are oil or gas production, inventory of raw, refined, or manufactured oil or gas production, or rights to or products of any of those, although the sale of those proceeds by a first purchaser to a buyer in the ordinary course of business as provided in Subsection (e) cuts off the security interest in those proceeds;

(B) the proceeds are accounts, chattel paper, instruments, documents, or payment intangibles; or

(C) the proceeds are cash proceeds, as defined in Section 9.102; and

(2) for the length of time provided in Section 9.315 for all other proceeds.

(d) This section creates . . . a lien that secures the rights of any person who would be entitled to a security interest under Subsection (a) except for lack of any adoption of a security agreement by the first purchaser or a lack of possession or record required by Section 9.203 for the security interest to be enforceable.

(e) The security interests and liens created by this section have priority over any purchaser who is not a buyer in the ordinary course of the first purchaser's business, but are cut off by the sale to a buyer from the first purchaser who is in the ordinary course of the first purchaser's business under Section 9.320(a). But in either case, whether or not the buyer from the first purchaser is in ordinary course, a security interest will continue in the proceeds of the sale by the first purchaser as provided in Subsection (c). . . .

(*l*) A first purchaser who acts in good faith may terminate an interest owner's security interest or statutory lien under this section by paying, or by making and keeping open a tender of, the amount the first purchaser believes to be due to the interest owner:

(1) if the interest owner's rights are to oil or gas production or its proceeds, either to the operator alone, in which event the operator is considered the first purchaser, or to some combination of the interest owner and the operator, as the first purchaser chooses;

(2) whatever the nature of the production to which the interest owner has rights, to the person that the interest owner agreed to or acquiesced in;

or

 (3) to a court of competent jurisdiction in the event of litigation or bankruptcy.

 (m) A person who buys from a first purchaser can ensure that the person buys free and clear of an interest owner's security interest or statutory lien under this section:

 (1) by buying in the ordinary course of the first purchaser's business from the first purchaser under Section 9.320(a);

 (2) by obtaining the interest owner's consent to the sale under Section 9.315(a)(1);

 (3) by ensuring that the first purchaser has paid the interest owner or, provided that gas production is involved, or the interest owner has so agreed or acquiesced, by ensuring that the first purchaser has paid the interest owner's operator; or

 (4) by ensuring that the person or the first purchaser or some other person has withheld funds sufficient to pay amounts in dispute and has maintained a tender of those funds to whoever shows himself or herself to be the person entitled.

TEX. BUS. & COM. CODE ANN. § 9.343.

 The commentary to § 9.320(a), which is referenced by § 9.343(m) quoted above, explains that its definition of "buyer in the ordinary course of business" derives from TEX. BUS. & COM. CODE § 1.201(9). *See* § 9.320, cmt. 3. Section 1.201(9)(b), in turn, defines

"buyer in the ordinary course of business":

 [A] person that buys goods in good faith, without knowledge that the sale violates the rights of another person, other than a pawnbroker, in the business of selling goods of that kind. *A person buys in the ordinary course if the sale to the person comports with the usual or customary practices of the kind of business in which the seller is engaged or with the seller's own usual or customary practices.* A person that sells oil, gas, or minerals at the wellhead or minehead is a person in the business of selling goods of that kind. . . . Only a buyer that takes possession of the goods or has a right to recover the goods from the seller under Chapter 2 may be a buyer in the ordinary course of business. *"Buyer in the ordinary course of business" does not include a person that acquires goods in a transfer in bulk or as security for or in total or partial satisfaction of a money debt.*

(Emphasis added.)

 Edge's claim may be summarized as follows: (1) that it had an interest in the gas created by subsection (a); (2) that the interest was not defeated by any notification requirement in light of the minimal nature of the requirements established by subsections (b) and (d); (3) that the interest followed the gas and thus attached to the proceeds of the sale to third parties pursuant to subsection (c); and thus (4) the interest was not limited to the proceeds of the sale by the debtors to Duke as provided in subsection (e), because (5) the debtors did not cut off Edge's lien by taking any of the actions specified in subsection (1); and (6) Duke did not cut off Edge's lien by taking any of the actions specified in subsection (m). Edge asserts that it has three sources of collateral: (1) the gas

that Edge sold to the debtors and the debtors sold to Duke; (2) the debtors' accounts receivable after the sale of the gas to Duke; and (3) the cash proceeds that Duke received from the sale of the gas to the third parties.[17] The gas is now gone, but Edge asserts that it may recover for conversion of either the gas or the proceeds from Duke's sale thereof.[18]

According to Duke, Edge's suit is barred because (1) any claim brought by Edge against Duke under the statute actually belongs to the debtors; or (2) the claim seeks to recover the property of the debtors' estates.[19] Duke alleges that Edge lacks standing, as a matter of law, to bring a claim against it under the statute, because subsection (c), quoted above, states that the lien inheres in "proceeds of that production owned by, received by, or due to the first purchaser." § 9.343(c). Duke reasons that because Edge alleges that Duke holds proceeds due to the debtors, it is asserting a harm to the debtors rather than to itself and has no standing to bring its claim.

We disagree. Edge does not assert harm to the debtors by alleging that Duke converted its security interest by selling the gas free and clear to a third party. Because the security interest was Edge's property, provided by § 9.343(a), Edge asserts harm only to itself, and because only Edge, as a gas producer, enjoys the statutory protection of § 9.343, only Edge has standing to assert a conversion claim with respect to that interest.[20]

"Whether a particular state cause of action belongs to the [debtor's] estate depends on whether under applicable state law the debtor could have raised the claim as of the commencement of the case." *Schertz-Cibolo-Universal City Indep. Sch. Dist. v. Wright (In re Educators Group Health Trust)*, 25 F.3d 1281, 1284 (5th Cir. 1994). Only Edge could assert a producer's lien against the proceeds from sale of the gas; neither the debtors nor any other plaintiff had one. Edge does not and need not assert that Duke converted or otherwise improperly acquired the debtors' property. Instead, it must and does assert only that Duke acquired the property outside the ordinary course of business (for example by accepting it in return for a debt) and thus acquired it subject to a lien. *See* § 1.201(b)(9). When Edge accuses Duke of converting that lien, it asserts that Duke improperly exercised dominion over its property, and it presses a claim that it has standing to bring.[21]

[17] *See* TEX. BUS. & COM. CODE ANN. § 9.315-(a)(2) (providing for the continuation of a security interest in the proceeds of the sale of secured collateral).

[18] Edge also claims that it could recover from the proceeds, in the form of accounts receivable by the debtors from Duke, from the sale by the debtors to Duke of the gas. As we have said, Edge has not pressed this claim, so it is not addressed here.

[19] *See Adacom Corp. v. Byrne (In re Schimmel-penninck)*, 183 F.3d 347, 350-51 (5th Cir. 1999); *S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition, Inc.)*, 817 F.2d 1142, 1150 (5th Cir. 1987).

[20] *See Lively v. Carpet Servs., Inc.*, 904 S.W.2d 868, 874 (Tex. App.SSHouston [1st Dist.] 1995, writ denied) (reasoning that where statute granted property right to creditor rather than bankrupt debtor, that right was enforceable by creditor against non-bankrupt defendant).

[21] *See Russell v. Am. Real Estate Corp.*, 89 S.W.3d 204, 210 (Tex. App.SSCorpus Christi 2002, no pet.) (definition of conversion); *Schertz-Cibolo-Universal City*, 25 F.3d at 1284 (stating (continued...)

11

Duke contends that this interpretation of the statute effectively creates strict liability for, and a live claim against, a stream of distant, downstream purchasers. Duke points out that gas traders frequently have few assets other than their accounts receivable and contends that the statute was passed to protect producers against secured creditors of bankrupt traders that provided working capital for the trades and seized all assets upon bankruptcy or failure of the trading company. *See* Grinstead, *supra,* 63 TEX. L. REV. at 311. Our interpretation, however, reads the statute to protect against a conceptually similar problem: self-help remedies by downstream creditors such as Duke who seize all the assets of a trading company and leave nothing left with which the bankrupt trader can repay the producer. Duke supplies no alternative explanation of the debt-collection exception to the holder-in-due-course rule, and the academic commentary that it cites is concerned mainly with whether the interest in proceeds supplied by subsection (c) is continuously perfected, not with whether a producer's lien on the gas may be enforced against a downstream purchaser.

Duke protests that, even if § 9.343(c) provided Edge with a lien on the gas, that lien did not transfer to the proceeds from Duke's resale of the gas under TEX. BUS. & COM. CODE ANN. § 9.315(a)(2), which provides for a security interest in the sale of secured property. Duke asserts that § 9.315 must be read in conjunction with § 9.343(c) and emphasizes that § 9.315(a) provides that a security interest shall attach to proceeds of sale of property in which a creditor has a security interest only

"except as otherwise provided in this chapter . . . ." Duke then urges that § 9.343(c) limits liens on proceeds from sale of the gas to proceeds due to the first purchaser. We, however, see no inconsistency among the provisions.

Section 9.343(c)'s provision of a lien upon proceeds due to the first purchaser is an addition to, rather than a limitation on, the lien on the gas. The fact that § 9.343(c) creates two liensSSone on the gas and one on the proceeds due to the first purchaser from its sale SSdoes not mean that the second lien operates to limit the recourse that may be had under the first. Section 9.343(c) provides that a gas producer may pursue recourse on its lien on the gas or the proceeds due the first purchaser, and § 9.315 provides that, should the producer pursue its lien on the gas, it also has a lien on the proceeds from resale of the gas by a downstream purchaser who resells the gas and whose purchase did not cut off the lien. Edge thus arguably (depending on the facts) possessed a lien on the gas and the proceeds from Duke's resale thereof.

## VII.

Edge, however, cannot recover its alleged security interest through an action for conversion against Duke. To show conversion, Edge must prove that Duke improperly exercised dominion over its security interest in the gas or the money (the proceeds of Duke's resale of the gas). Unfortunately for Edge, it cannot prove that Duke behaved improperly by reselling the gas, and an action for conversion of money is available only in limited circumstances that are not present here.

## A.

Edge contends, without merit, that Duke converted its interest in the gas by reselling it free and clear of Edge's security interest. To

[21](...continued)
that creditor has standing to assert claim against non-bankrupt debtor for injury to itself caused by the non-bankrupt debtor).

establish conversion, Edge must prove that (1) it owned or had a right to possession of the property; (2) the defendant assumed and exercised dominion and control over the property inconsistent with plaintiff's rights; and (3) the defendant refused plaintiff's demand for return of the property. *See Russell*, 89 S.W.3d at 210. At the time Duke exercised dominion over the gas, payment for the gas had not yet come due, and Edge had no right to enforce its interest in the gas. *See ITT Commercial Fin. Corp. v. Bank of the West*, 166 F.3d 295, 305 n.16 (5th Cir. 1999). Edge, however, contends that Duke's reselling the gas in the ordinary course of business, free of the encumbrance of Edge's security interest, constituted conversion. Edge further alleges that this repudiation of Edge's rights was so blatant and egregious as to foreclose any need for Edge to have demanded return of its property. We disagree.

It is true that Texas law recognizes some circumstances in which the repudiation of property rights is so blatant as to excuse the need for a demand in order to maintain an action for conversion. *See Loomis v. Sharp*, 519 S.W.2d 955, 958 (Tex. App.SSTexarkana 1975, writ denied). This is not one of them. Damningly, Edge does not cite a single case in which a party has recovered on a security interest supplied by § 9.343 in an action for conversion against a first purchaser, much less a downstream possessor such as Duke. The bankruptcy court found that Edge's sale to the debtors, consistent with prevailing practices in the gas industry, constituted implied consent to resale of the gas, before the due date of the payment, to downstream purchasers in the ordinary course of business. There is no reason to upset that finding on appeal.

Edge mounts two responses. First, it argues that implied consent is not sufficient to defeat a security interest holder's rights.[22] Second, it contends that, even if it did impliedly consent to resale of the gas, it did not impliedly consent to resale free and clear of its security interest. Although we acknowledge that rhetorical cannonballs can be hurled on both sides,[23] the bankruptcy court's analysis of Edge's expectations, in light of the prevailing practices in the oil and gas industry, is persuasive. And if Edge consented to resale of the gas in the ordinary course of business, its argument that it did not consent to the cutting off of its security interest at some point downstream is without merit, because that cutting off of the upstream security interest is a direct consequence of such sales. *See* § 9.343(e).

In any event, it is difficult to see how Duke's actions could be so egregiously violative of Edge's rights as to foreclose the need for a demand, which Edge has not made. Duke resold the gas before payment under a contract to which it was not privy came due. Conversion generally takes place only after refusal of a demand for return of the property, and only extraordinary circumstances excuse the need for a demand. *See Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d

---

[22] *See Conoco Inc. v. Amarillo Nat'l Bank*, 950 S.W.2d 790, 796 (Tex. App.SSAmarillo 1997) ("To establish that a secured party consented to a transfer of collateral and thereby waived his secured claim by implication there must be a clear, unequivocal, and decisive act of the party showing such a purpose or acts amounting to estoppel on his part."), *rev'd on other grounds*, 966 S.W.2d 853 (Tex. 1999).

[23] *See, e.g.*, *Pan Eastern Exploration Co. v. Hufo Oils*, 855 F.2d 1106, 1125 (5th Cir. 1988) (explaining that the defendant's taking "must be wholly without the owner's sanction or assent, either expressly or impliedly").

635, 651 (5th Cir. 1991). Duke, which never even had notice of Edge's rights, could hardly be said to have used the property so inconsistently with the manner in which it was received as to assert a property right inconsistent with that of the owner. *See Pierson v. GFH Fin. Servs. Corp.*, 829 S.W.2d 311, 314 (Tex. App.SSAustin 1992, no writ). Because Edge's implied consent to resale and failure to demand return of its security interest in the gas defeat its claim for conversion of the gas, we do not address Duke's alternative argument that it did not convert the gas because, on account of the gas's physical presence in the pipeline, Duke never possessed it.

### B.

As with its interest in the gas, Edge may not recover on its interest in the proceeds from Duke's sale of the gas through an action for conversion. Actions for conversion of money are available in Texas only where "money is (1) delivered for safekeeping; (2) intended to be kept segregated; (3) substantially in the form in which it is received or an intact fund; and (4) not the subject of a title claim by the keeper." *Edlund v. Bounds*, 842 S.W.2d 719, 727 (Tex. App.SSDallas 1992, writ denied).

Edge's argument that Duke, upon resale of the gas, was in the position of a trusteeSSholding Edge's money pending payment by the debtorsSSis somewhat feeble. This case is similar to *Mitchell Energy Corp. v. Samson Res. Co.*, 80 F.3d 976, 983-84 (5th Cir. 1996), in which we ruled that a cotenant on a mineral estate could not maintain an action for conversion of money where its cotenant had withdrawn gas from the ground, sold the gas, and refused to turn over the proper share of the proceeds. The bankruptcy court was correct to recognize that a party that benefits from proceeds subject to a statutory lien may be liable for conversion of such proceeds only if it

has notice of the lien, then accepts and benefits from the proceeds. *See Home Indem. Ins. v. Pate*, 814 S.W.2d 497, 498-99 (Tex. App.SS Houston [1st Dist.] 1991, writ denied).

The bankruptcy court found that Edge had put forth no summary judgment evidence indicating that Duke had notice that Edge held the lien and that Edge had not been paid by the debtors. Edge does not challenge that conclusion but alleges that Duke's knowledge of § 9.343 was enough notice to put it in the shoes of a trustee. Duke's notice, however, was not even close to those in Texas cases in which trustees have improperly disposed of assets.[24] Duke knew or may be presumed to have known the law, but did not know that Edge was owed the money. Without more, Edge cannot overcome Texas courts' traditional hostility to claims for conversion of money.

Edge alleges that our construction of the statute renders its rights nugatory. Our interpretation, however, does not foreclose creditors such as Edge from pursuing actions for collection; creditors are cut off only from actions for conversion with the attendant possibility of punitive damages against downstream property holders without notice of the producer's claims or the failure of the first purchaser to fulfill its contractual obligations. This is a reasonable construction of the statute and best approximates the legislative intent.

The judgment of the district court, affirming the bankruptcy court, is AFFIRMED.

---

[24] *See Prewitt & Sampson v. City of Dallas*, 713 S.W.2d 720, 722 (Tex. App.SSDallas 1986, no writ) (in which attorney improperly disbursed funds he knew to be due to insurance carrier).

14