# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 13-10325

United States Court of Appeals
Fifth Circuit

**FILED**

January 9, 2014

Lyle W. Cayce
Clerk

In the Matter of:  JAMES H. MOORE, III,

Debtor

------------------------------

THE CADLE COMPANY,

Appellant

v.

JAMES H. MOORE, III; ELIZABETH A. MOORE; JHM PROPERTIES, INCORPORATED; BRUNSWICK HOMES, L.L.C.,

Appellees

Appeal from the United States District Court
for the Northern District of Texas

Before DAVIS, GARZA, and DENNIS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

The Cadle Company ("Cadle") is a creditor of the bankruptcy estate of James H. Moore, III ("Moore").  Cadle originally brought suit against Moore in state court.  After Moore filed for bankruptcy, Cadle removed its action to the bankruptcy court and allowed the estate's trustee to assert its claims.  Over Cadle's protests, the trustee sought to settle the claims, and Cadle ultimately re-acquired them at auction.  But the bankruptcy court then found that Cadle

No. 13-10325

had paid the trustee's attorney's fees even after the two had become adverse over the settlement issue, and dismissed the adversary proceeding based on its inherent power to sanction a party for abuse of judicial process. The district court affirmed, and Cadle appeals. We reverse the district court, vacate the order of dismissal, and remand to the bankruptcy court.

## I

Cadle, an Ohio corporation, is the largest creditor of Moore's bankruptcy estate. Prior to Moore's filing for bankruptcy, Cadle sued Moore, Brunswick Homes, LLC ("Brunswick"), Moore's spouse, and JHM Properties (collectively, "defendants") in Texas state court. Under state-law theories of fraudulent conveyance, constructive trust, and reverse veil piercing, Cadle alleged that Moore had used Brunswick and the other entities to shield assets and avoid payment of debts. The law firm of Bell Nunnally & Martin LLP ("BNM") represented Cadle in this suit.[1]

Moore subsequently filed for bankruptcy. Cadle then removed its action to the bankruptcy court, where Cadle and Brunswick each filed proofs of claim. Cadle allowed the estate's trustee to assert the company's claims; the trustee was substituted as plaintiff in the adversary proceeding ("avoidance action") and engaged Cadle's counsel at BNM to serve as special counsel. Accordingly, Attorney Bruce Akerly ("Akerly") of BNM filed a special employment application indicating that BNM would represent the trustee on a contingency basis and that BNM owed fiduciary duties to only the trustee, not Cadle. Yet soon thereafter, in November 2006, BNM sent Cadle a letter confirming that Cadle would pay BNM's fees for its representation of the trustee, which fees would be reimbursed by BNM in the event of a positive outcome.

---

[1] The facts of this case were recounted in our opinion disposing of the previous appeal. *See The Cadle Co. v. Mims*, 608 F.3d 253, 255–57 (5th Cir. 2010).

2

No. 13-10325

Also at this time, BNM began representing Cadle in a separate, ultimately successful action to deny Moore's discharge ("discharge action"). *See* 11 U.S.C. § 727. Toward the end of the discharge action, BNM filed a motion to withdraw as special counsel to the trustee in the avoidance action. BNM's stated reason was that Cadle had refused to pay certain expenses—namely, fees for retaining an expert forensic accountant. As the bankruptcy court later noted, BNM's claim that Cadle had a duty to cover expenses in the avoidance action was inconsistent with both the special employment application, which stated that BNM would work only on a contingent-fee basis, and the (yet undisclosed) November 2006 letter, which obligated Cadle to pay only BNM's fees, not expenses. At the hearing on BNM's motion to withdraw, a BNM attorney explained that "Cadle instructed [BNM] that they didn't want [BNM] to do anything that would benefit the trustee from a cost and expense standpoint." The bankruptcy court denied BNM's motion to withdraw, noting the absence of any agreement obligating Cadle to pay either BNM's fees or litigation expenses, and expressing suspicion that Cadle cared more about success in the discharge action than in the avoidance action.[2]

A half-year later, the trustee announced a settlement agreement in the avoidance action. Under the agreement, the defendants would collectively pay the trustee $37,500. Subsequently, Cadle, through a new attorney, objected to the settlement and offered to buy back its claims for $50,000. At a hearing on the settlement motion, a Cadle employee testified about Cadle's $60,000 fee payments to BNM for its representing the trustee. The trustee later testified that he was "shocked" at learning about the fees and promptly requested

---

[2] Unless otherwise noted, all proceedings discussed below occurred in the avoidance action.

3

No. 13-10325

Akerly to disclose the arrangement. Akerly never did so, and the issue was not explored further at the time.

The bankruptcy court approved the settlement, and the district court affirmed. On appeal, BNM represented the trustee, and the new, non-BNM attorneys represented Cadle. Akerly departed BNM, and in his stead, a first-year BNM associate presented oral argument on behalf of the trustee before the panel. The panel reversed the district court's judgment and remanded, holding that the bankruptcy court erred by refusing to consider as an available option the sale of the claims to Cadle for an amount greater than the settlement offer. *Mims*, 608 F.3d at 266. On remand, the bankruptcy court permitted an auction, and Cadle acquired the claims for $41,500.

At the sale order hearing following the auction, the bankruptcy court's suspicions about conflicts of interest resurfaced. Akerly, purportedly on behalf of the trustee, sought a continuance in the adversary proceeding's trial date. The trustee had not instructed Akerly to seek a continuance, which appeared to benefit Cadle, who wanted more time to prepare for trial as the new plaintiff. The bankruptcy court approved the sale but ordered a short continuance and requested that Cadle address the apparent conflict of interest. At a hearing later that month, a Cadle employee testified that the company had continued to pay BNM's fees for approximately one year after becoming adverse to the trustee on the settlement issue. The employee explained that, in December 2008, a Cadle manager had discovered the payments and informed BNM that they would stop, and that the last payments were made in February 2009.

Thereafter, Moore and Brunswick filed a motion to dismiss on grounds of abuse of judicial process. They alleged, in addition to the improper fee payments, that BNM might have taken a "dive" during oral arguments on the previous appeal by having the first-year associate present oral argument. After a three-day evidentiary hearing, the bankruptcy court dismissed the

4

adversary proceeding based on its inherent power to sanction a party for abuse of judicial process.  The district court affirmed, and Cadle now appeals.

## II

Cadle first contends that the bankruptcy court had no constitutional authority to enter final judgment in this case.

"We review a district court's affirmance of a bankruptcy court decision by applying the same standard of review to the bankruptcy court decision that the district court applied."  *In re Frazin*, 732 F.3d 313, 317 (5th Cir. 2013) (citation omitted).  We review conclusions of law de novo and factual findings for clear error.  *Id.*

Article III of the Constitution places certain constraints on the statutory powers of bankruptcy courts.  The Supreme Court recently clarified these Article III constraints in *Stern v. Marshall*, 131 S. Ct. 2594 (2011).  The Court held that notwithstanding the bankruptcy court's statutory authority under § 157(b)(2)(C) to adjudicate an estate's counterclaim against a creditor, the bankruptcy court had no constitutional authority to enter final judgment on a state-law counterclaim because it would "not [be] resolved in the process of ruling on a creditor's proof of claim."  *Id.* at 2620; *see also In re Frazin*, 732 F.3d at 317–320.

Cadle contends that under *Stern*, the bankruptcy court lacked constitutional authority to enter final judgment because the avoidance action originated from and is based entirely upon state law and is thus wholly independent of the bankruptcy proceeding.  We disagree.  The bankruptcy court had authority to enter final judgment because Cadle's state-law claims "would necessarily be resolved in the claims allowance process."  *Id.* at 2618.  In *Stern*, the trustee asserted counterclaims to augment the estate apart from the bankruptcy proceeding.  Here, Cadle is a creditor who has filed a proof of claim for debts owed by the debtor, and resolving the state-law claims is

necessary to adjudicating its proof of claim.  Such claims by creditors against debtors are the very reason the claims allowance process exists.  *Cf. In re Frazin*, 732 F.3d at 320–24 (concluding that two of three counterclaims would necessarily be resolved in bankruptcy court's award of attorney's fees and were therefore within court's constitutional authority under *Stern*).

Contrary to Cadle's submission, the state-law basis of the claims is not dispositive.  Here, while Cadle's claims rest on state-law theories and were originally brought in state court, after Moore's filing for bankruptcy, the Bankruptcy Code governed the avoidance action.  *See, e.g.*, 11 U.S.C. §§ 544 (strong-arm powers), 548 (fraudulent transfers by debtor).  Accordingly, the bankruptcy court had constitutional authority to enter final judgment in this adversary proceeding.

## III

Cadle next contends that the bankruptcy court erred by not abstaining from hearing the avoidance action under the mandatory abstention provision of 28 U.S.C. § 1334(c)(2).

We review a bankruptcy court's decision not to abstain under § 1334(c)(2) for abuse of discretion.  *In re TXNB Internal Case*, 483 F.3d 292, 299 (5th Cir. 2007).  § 1334(c)(2) explains the conditions under which a district court must abstain from hearing a bankruptcy case:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

No. 13-10325

28 U.S.C. § 1334(c)(2). We have interpreted § 1334(c)(2) to mandate federal court abstention where "(1) [t]he claim has no independent basis for federal jurisdiction, other than § 1334(b); (2) the claim is a non-core proceeding . . . ; (3) an action has been commenced in state court; and (4) the action could be adjudicated timely in state court." *In re TXNB Internal Case*, 483 F.3d at 300 (citation omitted).[3]

Here, the bankruptcy court did not abuse its discretion in refusing to abstain under § 1334(c)(2). First, there was no "timely motion of a party." 28 U.S.C. § 1334(c)(2). The filing that Cadle cites as its "motion" requesting abstention was actually a motion challenging the court's constitutional authority under *Stern*. That the bankruptcy court construed the motion as a request to abstain does not rectify Cadle's failure. Moreover, timeliness is lacking. Cadle filed this motion nearly five years after removing the veil-piercing action to the bankruptcy court.[4] 28 U.S.C. § 1334(c)(2); *cf. In re Marshall*, 257 B.R. 35, 39 (Bankr. C.D. Cal. 2000) (finding untimely a motion for abstention filed eight months after adversary proceeding commenced).

Second, because the proceeding at issue is "core" under 28 U.S.C. § 157(b)(2) and not merely "related to" a title 11 case, it is not eligible for mandatory abstention under § 1334(c)(2). Cadle contends that the proceedings

---

[3] Under the second *TXNB Internal Case* prong, we defined "non-core" proceedings eligible for mandatory abstention as those "related or in a case under title 11." *In re TXNB Internal Case*, 483 F.3d at 300. This is not entirely correct. The statute provides that proceedings eligible for mandatory abstention must be "related to" a title 11 case, but *not* "arising in" such a case. 28 U.S.C. § 1334(c)(2). In *Stern*, too, the Supreme Court determined that the universe of "non-core" proceedings is co-extensive with that of "related to" proceedings; "core" proceedings are those "arising under" and "arising in" title 11 cases. *Stern*, 131 S. Ct. 2604–2605.

[4] Cadle implies that the motion was timely because it was filed "after [Cadle's] reacquiring the claims." But Cadle initially owned the claims and filed no motion then. Neither did the trustee file such a motion during the many years it owned the claim. In short, Cadle and the trustee had ample opportunity to request mandatory abstention but did not do so.

cannot be "core" because its purchase of the claims in 2011 nullified their connection to the estate. This argument is without merit. When Cadle originally removed the action to the bankruptcy court, Cadle itself represented that the proceedings were "core." And the change in the claims' ownership has no bearing on the proceeding's "core" status: Before the sale, the trustee asserted claims on behalf of a creditor, and after the sale, Cadle, the original creditor, asserted the same claims.[5]

Because Cadle failed to file a timely motion requesting the bankruptcy court to abstain, and because the claims at issue are "core" in nature, the court's decision not to abstain was not error.

## IV

Cadle finally contends that the court erred in dismissing the adversary proceeding under its inherent sanction power.

"We review de novo a district court's invocation of its inherent power and the sanctions granted under its inherent power for an abuse of discretion." *Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 619 F.3d 458, 460 (5th Cir. 2010) (citation omitted). A decision to invoke the inherent power to sanction requires a finding of "bad faith or willful abuse of the judicial process," which finding we review de novo. *Gonzalez v. Trinity Marine Grp., Inc.*, 117 F.3d 894, 898 (5th Cir. 1997) (citation omitted).[6] "[T]he finding of bad faith must be supported by clear and convincing proof." *Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001). In sum, we uphold a lower court's decision to invoke its inherent sanctioning power only if clear and convincing evidence

---

[5] As the post-auction Sale Order explains, the sale simply "substituted [Cadle] into the Adversary Proceeding as plaintiff in place of the Trustee . . . ."

[6] *See also In re Yorkshire, LLC*, 540 F.3d 328, 332 (5th Cir. 2008) (court must find "bad faith conduct" before imposing sanctions under inherent power); *Goldin v. Bartholow*, 166 F.3d 710, 722–23 (5th Cir. 1999) (same).

supports the court's finding of bad faith or willful abuse of the judicial process.[7] If this high threshold for invoking inherent powers is surmounted, we review the substance of the sanction itself more deferentially, for an abuse of discretion. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 55 (1991) (concluding that sanction of attorney's fees was not abuse of discretion).

We hold that because the bankruptcy court failed to find by clear and convincing evidence that Cadle acted in bad faith, it erred in invoking its inherent sanction power. *Crowe*, 261 F.3d at 563. Akerly and BNM's potential misconduct notwithstanding, the record does not establish that Cadle deliberately abused the judicial process—either before or after it became adverse to the trustee.

First and foremost, the bankruptcy court faulted Cadle for BNM's inadequate and inconsistent fee disclosures early on in the adversary proceeding. The parties do not dispute that BNM never disclosed to the court in its employment application Cadle's commitment to paying BNM's fees. The employment application claimed that any fees from the trustee would be contingent in nature, but just months later, BNM memorialized its fee arrangement with Cadle in the "smoking gun" November 2006 letter. Additionally, the bankruptcy court noted that BNM's claim at the May 2007 motion to withdraw hearing that Cadle had promised to cover litigation expenses—not fees—was "inconsistent" with both BNM's employment

---

[7] At the October 2011 hearing on the motion to dismiss, the bankruptcy court suggested that certain cases apply lower thresholds to the application of inherent power sanctions, such as a finding that the "very temple of justice has been defiled," *Bartholow*, 166 F.3d at 722–23, or that a party shows "callous disregard of its responsibilities" to the court, *Smith v. Smith*, 145 F.3d 335, 344 (5th Cir. 1998). In fact, these standards are not more lax; we explained in those same cases that a sanctioning court must find bad faith. *Bartholow*, 166 F.3d at 722–23; *Smith*, 145 F.3d at 344.

application, which did not mention Cadle's role, and with Cadle's (then undisclosed) commitment to paying only BNM's fees.

Yet BNM's nondisclosure and inconsistency, while justifying scrutiny, are not alone clear and convincing evidence of Cadle's bad faith or willful misconduct.[8] Cadle account officer Jeanne Isler specifically testified that she had no knowledge of any separate fee agreement between BNM and the trustee. Moreover, at this stage in the proceeding, the interests of Cadle and the trustee had not yet become adverse, so Cadle's fee payments were not yet problematic. *See Mims*, 608 F.3d at 256 (noting that Cadle "advanced over $60,000 in attorneys' fees to the trustee's attorneys" after the trustee took over Cadle's claims). Even under Moore and Brunswick's premise that Cadle had an affirmative duty to disclose the trustee's attorney's potential conflict of interest,[9] the record bears out no clear and convincing evidence of any bad-faith violation of this duty. To the contrary, Cadle representatives candidly testified about fee payments to BNM at hearings in 2007 and 2008. In fact, during the sale order hearing, the bankruptcy court even recalled its earlier knowledge of the fee arrangement.

The bankruptcy court next took issue with BNM's 2007 attempt to withdraw as counsel to the trustee in the avoidance action. Suggesting that a conflict between Cadle and the trustee had materialized even at this early stage, the court cited a BNM attorney's testimony that "Cadle instructed [BNM] that they didn't want [BNM] to do anything that would benefit the trustee from a cost and expense standpoint . . . ." The bankruptcy court noted

---

[8] The bankruptcy court issued a separate show-cause order concerning sanctions against Akerly. Under Bankruptcy Code Section 327 and Bankruptcy Rule 2014, the trustee's attorney clearly has disclosure obligations. *See also In re West Delta Oil Company*, 432 F.3d 347 (5th Cir. 2005).

[9] We need not decide today whether the legal duty of disclosure belongs *solely* to the trustee's attorney, as Cadle submits.

its suspicion that Cadle, like many large creditors, cared only about the discharge action and not the trustee's success in the avoidance action.

Again, the bankruptcy court's mere suspicions do not add up to clear and convincing evidence of Cadle's bad faith. Cadle's "instructing" BNM not to incur certain litigation expenses suggests disagreement between Cadle and BNM regarding litigation strategy and expense allocation in the avoidance action, but does not constitute clear and convincing evidence of Cadle's bad faith. At this time, Cadle and the trustee were aligned in their objective of recovering assets for the estate. In fact, Cadle continued to pay BNM's fees in connection with motions and trial preparation; the company refused only to pay for an expert forensic accountant.[10]

The bankruptcy court further suggests that bad faith can be deduced from evidence of the benefits reaped by Cadle after it became directly adverse to the trustee. The court suggests that the company sabotaged BNM's representation of the trustee and purposefully obtained privileged information revealing the trustee's litigation strategy. But both allegations find insufficient support in the record. As to the first claim that Cadle influenced BNM's representation of the trustee, the court relies only on the facts that Akerly left BNM, that the firm had no definite plans for identifying his replacement, and "a decision was made" to allow a first-year associate to present arguments.[11] None of these facts indicates that *Cadle* "willful[ly]"

---

[10] At the hearing that explored the history of Cadle's fee payments, even counsel for Moore explained that at the point of BNM's 2007 motion to withdraw, there "wasn't an actual conflict . . . between trustee and . . . Cadle . . . ." Moreover, Jeanne Isler, Cadle's account officer, testified that Cadle did not refuse to pay for the expert "for the purpose of gaining some sort of leverage over the [t]rustee in negotiating" Cadle's buy-back of the claims.

[11] We have reviewed the oral argument from the previous appeal. The first-year associate's performance did not suggest any purposeful sabotage of the appeal by Cadle. Cadle also points out an awkward reversal: Before oral argument in the previous appeal, Moore and Brunswick had claimed that oral argument would be a wasteful exercise, but now, they contend that the botched argument was a critical factor in our decision. Additionally,

tainted the judicial process. *Trinity Marine Grp.*, 117 F.3d at 898. Neither does the bankruptcy court substantiate its suggestions that Cadle purposefully obtained privileged information appearing on BNM's bills for its work for the trustee. Finally, the bankruptcy court's narrative is factually inconsistent. Cadle indeed continued to pay BNM's fees after Cadle became adverse to the trustee on the settlement issue, but far from obtaining any benefit, Cadle actually *lost* in the bankruptcy court and then again in the district court. Cadle ultimately prevailed on the previous appeal before us, but Cadle's payments to BNM had stopped well before the appeal was filed; no clear and convincing evidence links the victory to Cadle's fee payments or influence.[12]

Finally, the bankruptcy court imputes BNM's alleged misconduct to Cadle. The court's theory is that because the company is a "sophisticated party that regularly hires lawyers to monetize assets," Cadle was accountable for "its" lawyers, who represented the trustee. Thus, the nondisclosures and conflicts of interest are "attributable" not only to BNM, but also to Cadle.

The bankruptcy court's approach controverts well-established rules of agency law. An agent's acts and mental states are imputed to his principal when the agent acts on behalf of the principal. *See U.S. ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 727 F.3d 343, 348 (5th Cir. 2013). Here, at all relevant times in the avoidance action, BNM was the agent of the trustee, not of Cadle. In both BNM's employment application and its November 2006 letter to Cadle, the law firm explained to Cadle that the trustee was its sole client in the

---

we are troubled by the bankruptcy court's use of indirect inferences. The court claims that "some ambiguous person" decided to task the first-year associate with oral argument, but Akerly unambiguously testified that he made this "good" decision himself. Similarly, the court suggests that Cadle's termination of fee payments to BNM was surreptitious ("None of us . . . know who exactly said what to whom when Creditor-Cadle stopped paying BNM's bills"); in fact, testimony established that in December 2008, a Cadle manager discovered the incorrect payments and promptly notified BNM that the payments would end.

[12] Cadle filed the previous notice of appeal in June 2009.

avoidance action.[13]  No clear and convincing evidence shows that Cadle had somehow appropriated BNM as its own agent.  BNM's attempt to withdraw from representing the trustee in the avoidance action, in fact, manifested the tension between its fiduciary duty to the trustee and its reliance on Cadle's payment of litigation expenses.  And the fact that BNM received fees from Cadle, unbeknownst to the trustee, did not destroy this agency relationship and transform BNM into the agent of Cadle.  Rather, under agency principles, an agent must account to his principal for any gains beyond the agent's agreed-upon compensation.[14]  Thus, BNM should have relinquished any fees received from Cadle, but the agency relationship between BNM and the trustee—established when BNM became the trustee's special counsel—remained intact. *Cf.* 11 U.S.C. § 328(c) (enabling court to require disgorgement of fees arising from conflict of interest).

After Cadle and the trustee became adverse on the settlement issue, there is even less basis for construing BNM as Cadle's agent.  BNM continued to represent the trustee in directly opposing Cadle and was successful in these efforts until our decision on the last appeal.  Thus, because BNM was not acting as Cadle's agent before or after the settlement dispute arose, we cannot impute the firm's acts or mental states to Cadle.[15]  *Cf. Payne v. C.I.R.*, 224 F.3d 415,

---

[13] The "smoking gun" November 2006 letter stated that "although The Cadle Company is a creditor in this suit and its interests are clearly aligned with those of the Trustee, our firm's client in the adversary action is the Trustee and we are, therefore, required to take direction solely from the Trustee."

[14] *See* RESTATEMENT (SECOND) OF AGENCY § 8.02 ("An agent has a duty not to acquire a material benefit from a third party in connection with transactions conducted or other actions taken on behalf of the principal or otherwise through the agent's use of the agent's position.").

[15] The agency principles outlined here are relevant to our rejection of Cadle's additional claim that as a matter of law, nondisclosure is insufficient to establish fraud on the court and thereby cannot warrant outright dismissal. Cadle relies on *Fierro v. Johnson*, 197 F.3d 147 (5th Cir. 1999), for the proposition that fraud on the court is established only with "an unconscionable plan or scheme . . . designed to improperly influence the court in its

420 (5th Cir. 2000) (refusing in civil tax fraud case to impute fraud, reviewed under same "clear and convincing evidence" standard).

We are not unsympathetic to the bankruptcy court's concerns about the "unpleasant odor" of this adversary proceeding. The record suggests that BNM made several miscommunications about fee arrangements. And after Cadle became adverse to the trustee, it should have recognized immediately the conflict of interest and ceased all fee payments to BNM. Cadle's management of the avoidance action was inept, at best. But even at its worst, the evidence is not enough to sustain an inherent power dismissal. This appeal turns on whether clear and convincing evidence demonstrates that Cadle, not the BNM attorneys, willfully abused the judicial process. Neither imputed bad faith nor suspicion alone justifies the invocation of the inherent power. In sum, all of the bankruptcy court's theories fall short of the stringent standard of clear and convincing evidence of bad faith.[16] *Crowe*, 261 F.3d at 563.

## V

For the foregoing reasons, we REVERSE the district court, VACATE the order of dismissal, and REMAND to the bankruptcy court for further proceedings.

---

discretion," and that "less egregious misconduct, such as nondisclosure to the court of facts allegedly pertinent to the matter before it, will not ordinarily rise to the level of fraud on the court." *Id.* at 154 (citation omitted). However, there, we held that because a nondisclosure in a state criminal case was neither actually nor constructively known to the government's attorneys in the later federal habeas case, there was no fraud on the court in the latter case. *Id.* at 155. We reasoned that we could not impute the police officer's and prosecutor's knowledge of the perjury and the tainted evidence in the state court trial to the government attorneys in the habeas case because the "relationship [between the parties] is too attenuated." *Id.* In short, the decisive factor in *Fierro* for our analysis of fraud on the court was the imputation of knowledge (and resultant bad faith), not simply whether a nondisclosure was at issue.

[16] Because the bankruptcy court had no legal authority in the first place to invoke its inherent sanction power, we have no occasion to review the substance of the sanction for abuse of discretion.