# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 10, 2026

Lyle W. Cayce
Clerk

—————

No. 24-20477

—————

In the Matter of EP Energy E&P Company, L.P.,

*Debtor*,

Storey Minerals, Limited; Storey Surface, Limited;
Maltsberger, L.L.C.; Maltsberger/Storey Ranch,
L.L.C.; Maltsberger/Storey Ranch Lands, L.L.C.; Rene
R. Barrientos, Limited,

*Appellants*,

*versus*

EP Energy E&P Company, L.P.,

*Appellee*.

—————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:21-CV-4148

—————————————————————

Before Elrod, *Chief Judge*, and Duncan and Engelhardt, *Circuit Judges*.

Kurt D. Engelhardt, *Circuit Judge*:

Appellants Storey Minerals, Ltd., et al. (collectively, the "MSB Owners") appeal adverse rulings regarding subject-matter jurisdiction, ripeness,

No. 24-20477

and the merits of their post-petition "administrative expense" claims, presented under 11 U.S.C. § 503(b)(1)(A), in Debtor–Appellee EP Energy E&P Co., L.P.'s ("EP" or "EP Energy") Chapter 11 bankruptcy case. As stated herein, we AFFIRM.[1]

## I.

The MSB Owners are the lessors/landowners for 16 "non-standard" mineral (oil and gas) leases (collectively, the "Leases") on land located in South Texas (hereinafter, the "Leased Premises").[2] Chapter 11 Debtor–Appellee EP is the lessee/operator for the Leases. EP and its affiliates (the "Reorganized Debtors") filed Chapter 11 bankruptcy cases on October 3, 2019 (the "Petition Date").

In early May 2020, during the pendency of EP's Chapter 11 bankruptcy case, a substantial decrease in demand for oil (associated with the COVID-19 pandemic and other market forces) caused market prices to collapse. Seeking to avoid producing oil that would be sold at a loss, or not at all, EP temporarily ceased production on the Eagle-Ford field, which included wells on the Leased Premises. Within 40 days, however, EP resumed production.

On August 27, 2020, the bankruptcy court confirmed EP's Plan of Reorganization ("Plan").[3] The Plan became effective on October 1, 2020

---

[1] Additionally, EP's pending motion to supplement the record on appeal is DENIED as MOOT.

[2] *See* Lease dated October 31, 2019, Record on Appeal ("ROA") 12536–12668. The parties agree that all of the leases are "substantially the same." Thus, references herein to the "Lease" or "Leases" apply equally to all 16 leases unless otherwise stated.

[3] *See* Plan, ROA.4023–94; Confirmation Order, ROA.3971–4021.

(the "Effective Date").[4] In accordance with the Plan, the bankruptcy court set October 31, 2020 as the "Administrative Expense Claims Bar Date," i.e., the deadline, unless otherwise provided by the Plan, court order, or agreement, for filing requests for payment of "Administrative Expense Claims" under 11 U.S.C. § 503. *Id.*[5] Regarding the October 31, 2020 deadline, the Notice additionally states:

> Holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting Administrative Expense Claims against the Debtors, or their property and such Administrative Expense Claims shall be deemed discharged as of thirty (30) days after the Effective Date.[6]

---

[4] *See* October 1, 2020 Notice of (I) Effective Date, (II) Entry of Order Approving Disclosure Statement on Final Basis, and (III) Entry of Order Confirming Modified Fifth Amended Joint Chapter 11 Plan of EP Energy Corporation and its Affiliated Debtors ("Notice"), ROA.4291–93; *see also* 11 U.S.C. § 1141 ("Effect of Confirmation").

[5] Section 503 of the Bankruptcy Code provides, in pertinent part:

**(a)** An entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause.

**(b)** After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

**(1)(A)** the actual, necessary costs and expenses of preserving the estate including . . . .

*See* 11 U.S.C. § 503. A request for payment of administrative expense is made by motion filed in accordance with the requirements of Rule 9014 of the Federal Rules of Bankruptcy Procedure. *See In re TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992); FED. R. BANKR. P. 9014(a) ("In a contested matter not otherwise governed by these rules, relief must be requested by motion.").

[6] As defined in the Plan:

No. 24-20477

On October 30, 2020, the MSB Owners filed a motion in the bankruptcy court entitled "MSB Owners' Renewed Motion for Allowance of Administrative Expense Claims Pursuant to Section 503(b)(1)(A) of the Bankruptcy Code" (hereinafter referred to as "the October 30 Motion" or "the Administrative Expense Motion").[7] Contending that EP's interim

---

"***Administrative Bar Date***" means the date that requests for payment of Administrative Expense Claims (other than Fee Claims) must be filed with the Bankruptcy Court and served on the Debtors . . ., as applicable, that is thirty (30) days after the Effective Date."

"***Administrative Expense Claim***" means any Claim constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b)(3) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (a) the actual and necessary costs and expenses incurred after the Petition Dates and through the Effective Date of preserving the Estates and operating the businesses of the Debtors. . . .

"***Claim***" means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

According to Section 101(5), the term "claim" means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

*See* 11 U.S.C. § 101(5).

[7] *See* October 30 Motion, ROA.11613–633. Regarding the filing of an Administrative Claim, Sections 5.2(b) and 11.1(e) of the Plan provide:

**§ 5.2–*Treatment of MSB Claims, Interests, and Controversies***

(b) Postpetition to Pre-Effective Date and Administrative Claims

Nothing in the Plan or this Confirmation Order shall modify or otherwise alter: (i) the rights of MSB to file an Administrative Claim for alleged

4

cessation of production had caused the Leases to terminate[8]—such that "EP's continued oil and gas exploration activities" on the Leased Premises constitute "an ongoing trespass giving rise to trespass damages"[9] under Texas law—the October 30 Motion asserts that those damages qualify as "actual, necessary costs and expenses of preserving the estate" for purposes of 11 U.S.C. § 503(b)(1)(A).[10] Despite also arguing that "all claims arising from and after the Debtors' Petition Date should pass through and remain payable in full,"[11] the MSB Owners confirm that, "to the extent applicable

---

damages relating to postpetition, but Pre-Effective Date, actions of the Debtors in respect of the MSB contracts; (ii) defenses, counterclaims, or rights of the Debtors and the Reorganized Debtors, as applicable, to object on any basis to any such alleged Administrative Claims; or (iii) MSB's retention of all real property interests and equitable remedies under the MSB Contracts that do not constitute Claims; *provided however*, that 5.2(b)(i) and (ii) above are subject to the Administrative Bar Date, and *provided further* that the Bankruptcy Court retains exclusive jurisdiction to determine whether any dispute with respect to section 5.2(b)(iii) comprises a Claim, which threshold determination may be heard upon motion of MSB, the Debtors, or the Reorganized Debtors, as applicable.

**§ 11.1 (e)–*Retention of Jurisdiction***

Pursuant to sections 105(c) and 1141 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on or after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, . . .

> (e) to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim . . . .

[8] *See* October 30 Motion, ¶¶ 21, 23.

[9] *Id.* ¶ 23.

[10] *Id.* ¶¶ 23–24, 40, 47; *id.* ¶¶ 42–47.

[11] *Id.* ¶ 42; *see also id.* ¶ 39 ("The MSB Owners contend the matters herein should pass through and be fully payable to the extent adjudication is need in further actions for

and covered by the Administrative Bar Date,"[12] the motion was filed "to preserve and protect their entitlement to relief."[13] Additionally, reporting that "several [issues and claims] require further adjudicatory proceedings"[14] and "involve state law matters and events that occurred both during the Cases and after the Effective Date,"[15] the motion states, in paragraph 12: [16]

> In connection with the filing of this Motion, the MSB Owners will also file a motion seeking threshold determination of status by this Court in accordance with and pursuant to paragraph 46 of the Confirmation Order[17] with an attached petition to be

---

all of the matters herein. If Debtors contend otherwise, then these are asserted for preservation and recovery if needed.").

[12] *Id.* ¶ 11.

[13] *Id.*, *see also id.* ¶¶ 23–24, 42–47; *id.* ¶39 (characterizing the trespass damages as an "Administrative Expense Claim" that is "entitled . . . to administrative priority [under § 503(b) and § 507(a)(2)] as [an] administrative expense claim[].");  *id.* ¶ 40 ("The MSB Owners respectfully request that the Court enter an order allowing and/or preserving the MSB Owners['] entitlement to an administrative expense claim and requiring [EP] to pay the MSB Owners the full value of the administrative expense claim as determined and awarded."); *id.* ¶ 41 ("The MSB Owners reserve all rights to pursue any other obligations owing from and after the Effective Date as well as any others arising under the MSB Leases during the Cases if subject in any manner to the Administrative Bar Date, and to further pursue relief for prior termination of any of the Leases as may have occurred."); *id.* ("Conclusion") ("request[ing] that the Court enter an order allowing the MSB Owners' administrative expense claim and granting such other relief as this Court deems just and proper").

[14] *Id.* ¶ 45.

[15] *Id.*

[16] *Id.* ¶ 12.

[17] Paragraph 46 of the Confirmation Order states, in pertinent part:

(i) Post-Petition to Pre-Effective Date and Administrative Claims

Nothing in the Plan or this Confirmation Order shall modify or otherwise alter: (i) the rights of MSB to file an Administrative Claim for alleged damages relating to postpetition, but pre-Effective Date, actions of the Debtors in respect of the MSB contracts; (ii) defenses, counterclaims, or

filed in state court setting forth the basis of the MSB Owners' post-petition termination of the leases and associated tort claims ("the Threshold Motion"). For present purposes, this Motion seeks to assert and thereby preserve any administrative claim status should there be damages emanating during the cases from that separate litigation to come.

Six days later, on November 5, 2020, the MSB Owners filed a motion entitled "MSB Owners' Motion for Threshold Determination that Proposed Petition Does Not Include a Prepetition Claim." The motion was accompanied by a proposed order and petition (hereinafter referred to as "November 5 Motion, Proposed Order, and Proposed Petition").[18] Emphasizing that the MSB Owners were seeking a determination that the Leases had terminated (under Texas law) as a result of EP's *post*-petition conduct, and that EP's resulting trespass/conversion continued after the Plan's Effective Date, the MSB Owners' November 2020 submissions confirmed their desire to have a state court adjudicate the merits of the state-

_____

rights of the Debtors and the Reorganized Debtors, as applicable, to object on any basis to any such alleged Administrative Claims; or (iii) MSB's retention of all real property interests and equitable remedies under the MSB Contracts that do not constitute Claims; *provided however*, that sections 5.2(b)(1) and 5.2(b)(ii) of the Plan and (i) and (ii) of this paragraph are subject to the Administrative Bar Date and provided further that the Bankruptcy Court retains exclusive jurisdiction to determine whether any dispute with respect to section 5.2 (b)(iii) of the Plan comprises a Claim, which threshold determination may be heard upon motion of MSB, the Debtors, or the Reorganized Debtors, as applicable.

[18] *See* November 5 Motion, ROA.11648-54; Proposed Order, ROA.11763-64; Proposed Petition, ROA.11655–66.

law lease-termination/trespass damages claims underlying their §503(b)(1)(A) administrative expense claims.

Specifically, the November 5, 2020 motion states in footnote 2:

> The MSB Owners['] [October 30] Administrative Claim Motion requests that the amounts awarded for trespass as adjudicated in conjunction with the equitable remedies for termination would be best heard together in the state court action, and that the damages whether for good or bad faith trespass then be payable in full as awarded in the state court action when decided, without need for further reservation in the resolution of the Administrative Claim Motion, since such claims would be payable in any event by the post bankruptcy [EP] as a reorganized debtor.

Relatedly, Paragraph 5 of the proposed order provides:

> The MSB Owners' request in the [proposed] Petition[19] for trespass damages, if applicable, will be adjudicated in the state court and payable by [EP] as to any amounts awarded by the state court in full without regard to the [EP] bankruptcy case and plan.

Over the ensuing several months, numerous submissions raising and disputing a number of issues, including jurisdiction, abstention, and state law, followed. On December 14, 2021, the bankruptcy court rendered its

---

[19] Replacing the proposed petition that accompanied the November 5, 2020 motion, an "updated proposed petition (filed on November 1, 2021) identifies "conversion" as a "cause of action" to be asserted, alleging that "Defendants have and on a continued basis and without right wrongfully and intentionally conducted operations and removed hydrocarbons and obtained proceeds therefrom from the Leased Premises despite the termination of the Leases." The updated proposed petition also contends that "[EP]" is a "bad faith trespasser" under Texas law.

decision.[20] Reasoning that 28 U.S.C. § 1334(b) and § 157 grant it jurisdiction over § 503(b)(1)(A) requests for payment of administrative expenses, and that the MSB Owners' October 30 motion presented § 503 requests for payment, the bankruptcy court held that its jurisdictional authority necessarily included determining the validity (under state law) of the MSB Owners' underlying lease-termination/trespass claim.[21] And, characterizing "the MSB Owners' jurisdictional objections [as] amount[ing] to equitable arguments in favor of the Court abdicating its role in administrating EP['s] bankruptcy estate," the bankruptcy court decided that permissive abstention, authorized by 11 U.S.C. § 1334(c), was "[o]n balance . . . unwarranted."[22]

Proceeding to the merits of the state-law components of the MSB Owners' administrative expense claims, the bankruptcy court held: (1) EP's temporary cessation of production had *not* terminated the Leases; (2) EP's continued operations on the Leased Premises did *not* constitute a trespass;

---

[20] *See* December 14, 2021 Memorandum Opinion (hereinafter "Bankr. Ct. Op."), ROA.15387–15433; *In re EP Energy E&P Co.*, No. 19-35647, 2021 WL 5917771 at *1, 5–12 (Bankr. S.D. Tex. Dec. 14, 2021).

[21] *Id.* at 1–2, 9–24 & n.12; *In re EP Energy E&P Co.*, No. 19-35647, 2021 WL 5917771, at *12 ("[T]he MSB Owners chose to seek an administrative expense based on [EP]'s conduct following the lease termination. Determining whether the MSB Owners are entitled to an administrative expense, as well as the amount of those claims, requires the Court to reach the equitable element of the Claim."); *Id.* at 24 n.12; *In re EP Energy E&P Co.*, No. 19-35647, 2021 WL 5917771, at *12 n.12. ("The Court has jurisdiction over the Temporary Cessation Claim *because* it is a core matter, and its outcome could affect EP Energy's bankruptcy estate. While the lease termination issue turns on Texas law, the issue presents a legal question that must be resolved in assessing the Claim's validity").

[22] *Id.* at 24 n.12; *In re EP Energy E&P Co.*, No. 19-35647, 2021 WL 5917771, at *12 n.12.

No. 24-20477

and (3) the MSB Owners were *not* owed damages.[23] Concluding that the MSB Owners had presented a "futile" administrative expense claim against EP's estate, the bankruptcy court denied it.[24]

Affirming the bankruptcy court's disposition, the district court rejected the MSB Owners' arguments regarding jurisdiction, abstention, due process, and applicable Texas law.[25] The instant appeal followed.

## II.

When reviewing the decision of a district court acting as an appellate court, we "apply[] the same standard of review to the bankruptcy court's conclusions of law and findings of fact that the district court applied." *In re JFK Cap. Holdings, L.L.C.*, 880 F.3d 747, 751 (5th Cir. 2018) (quoting *Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 270 (5th Cir. 2015) (en banc)); *see also In re Sanchez Energy Corp.*, 159 F.4th 309, 317 (5th Cir. 2025) ("The same standards apply to this court's review of bankruptcy court decisions and the district court in its appellate function over those decisions."). Accordingly, questions of fact are reviewed for clear error and conclusions of law, including "[a] bankruptcy court's subject matter jurisdiction," are reviewed *de novo*. *In re Sanchez*, 159 F.4th at 317. Mixed questions of law and fact also are reviewed *de novo*. *Countrywide Home Loans, Inc. v. Cowin (In re Cowin)*, 864 F.3d 344, 349 (5th Cir. 2017).

---

[23] *Id.* at 1–2, 25–47; *In re EP Energy E&P Co.*, No. 19-35647, 2021 WL 5917771, at *1, 5–12.

[24] *See* December 14, 2021 Order, ROA.5713.

[25] *See* Dist. Ct. Op., ROA.15660–93; *In re EP Energy E&P Co.*, 752 F. Supp. 3d 647, 656–72 (S.D. Tex. Sept. 30, 2024).

No. 24-20477

On appeal, the MSB Owners challenge the bankruptcy court's assessments of jurisdiction and the proper application of Texas substantive law. For the reasons stated herein, we affirm both.

III.

First, we address the bankruptcy and district courts' jurisdiction and the MSB Owners' arguments regarding ripeness. Reiterating that they "wanted to file a lawsuit in state court . . . to obtain a declaration that the Leases [had] terminated as a result of production cessation[,] and to obtain damages for torts such as trespass and conversion for EP[]'s activities on [their] land after the Leases terminated,"[26] the MSB Owners argue: "The lower courts erroneously found bankruptcy jurisdiction, usurping states' rights to decide state-law claims."[27] They maintain that "[t]he determination of Lease termination and tort claims . . . belonged in state court" and that [t]he [bankruptcy and district] courts should not have adjudicated the MSB Owners' State-Law Claims on the merits because they lacked jurisdiction to do so."[28] The MSB Owners additionally argue that "the lower courts should not have adjudicated the merits of the State-Law Claims as part of a decision on [their § 503(b) administrative expense claim], because the [§ 503(b) administrative expense claim] itself was not ripe for adjudication" and "rested on numerous contingent events that have not occurred here."[29]

We disagree. In support of this decision, we emphasize that the MSB Owners' October 30 motion unequivocally characterizes their requested

---

[26] *See* Appellants' Orig. Br., at 6–7.

[27] *Id*. at 12.

[28] *Id.*

[29] *Id*. at 13.

11

No. 24-20477

"post-petition trespass damages" as "administrative expenses" for purposes of 11 U.S.C. § 503.[30] The § 503 designation is significant.

## A.

An "administrative expense," as defined by § 503, includes "the actual, necessary costs and expenses of preserving the estate. *See* 11 U.S.C. § 503(b)(1)(A).[31] As noted in the MSB Owners' October 30 motion,[32] § 503(b) administrative expenses, if allowed (after notice and a hearing), have the second highest priority level for unsecured claims. *See* 11 U.S.C. § 507(a)(2) (designating allowed § 503(b) administrative expenses as second in order of priority); *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir. 2001) (Section 503(b) administrative expenses "are to be given

---

[30] *See* October 30 Motion, at 5, 8–10, 16–20.

[31] Tort damages arising from and during the course of the debtor's post-petition business operations may constitute "actual, necessary costs and expenses of preserving the estate." *See Reading v. Brown*, 391 U.S. 471, 475, 478, 482–86 (1968); *In re Jack/Wade Drilling, Inc.*, 258 F.3d at 390 ("Because the receiver [in *Reading*] had chosen to operate the estate to improve the position of the existing creditors, fairness dictated that the injured claimant be entitled to recover its damages at the expense of the existing creditors when the receiver operated negligently."); *In re Resource Tech. Corp.*, 662 F.3d 472, 476–77 (7th Cir. 2011) (explaining treatment of tort liability as a § 503 "administrative expense); *In re TransAmerican Nat. Gas. Corp.*, 978 F.2d 1409, 1420 (5th Cir. 1992) (reasoning that "benefit" to the estate, for purposes of § 503(b)(1)(a), includes the debtor's ability to "continue to conduct its business, thus generating funds from which prepetition creditors can be paid"); *In re Al Copeland Enter.*, 991 F.2d 233, 240 (5th Cir. 1993) (granting administrative expense priority under § 503(b)(1)(A) for statutory interest accruing in favor of the State of Texas, post-petition, on unpaid sales tax revenues ). Considering the MSB Owners' express invocation of § 503 and our resolution of this appeal, we assume without deciding that the damages they seek qualify as "actual, necessary costs and expenses of preserving the estate." *See, e.g.*, *Matter of Bouchard Transp. Co., Inc.*, 74 F.4th 743, 749 (5th Cir. 2023) (identifying satisfaction of § 503(b) as a "quintessential 'mixed' question of law and fact").

[32] *See* October 30 Motion, at 16–18.

priority in distribution such that they are generally paid in full before other unsecured non-priority claims.").[33]

Also, a proceeding to determine a request for payment of administrative expenses, pursuant to § 503(a) and (b)(1)(A), is a "core proceeding"—one arising under title 11, or arising in a case under title 11— for purposes of the jurisdictional provisions of 28 U.S.C. § 1334(b) and § 157(a)–(b). [34] *See In re Chesapeake Energy Corp.,* 70 F.4th 273, 281 (5th Cir. 2023) ("[A] reorganized debtor often must resolve, post-confirmation, the amounts owed on proofs of claim, *administrative claims*, preference and fraudulent transfer claims, and attorneys' fees, all of which fall within 'core' bankruptcy jurisdiction." (emphasis added)). Accordingly, a bankruptcy court has jurisdiction to "hear and determine" § 503 requests for payment of administrative expense—i.e., may render a final order, judgment, or decree appealable to the district court.[35] In fact, the MSB Owners' October 30, 2020 motion expressly recognizes:

> The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter

---

[33] Section 507 states, in pertinent part: "The following expenses and claims have priority in the following order . . . . (2) Second, administrative expenses allowed under section 503(b) of [title 11][.]" *See* 11 U.S.C. § 507(a)(2).

[34] *See In re Galaz*, 765 F.3d 426, 431 (5th Cir. 2014) ("A core proceeding either invokes a substantive right created by federal bankruptcy law or one which could not exist outside bankruptcy."); *see also In re Wood*, 825 F.2d 90, 96–98 (5th Cir. 1987) (providing a detailed discussion of § 1334's "arising under" and "arising in" phrases and explaining why "the filing of a proof of claim" that is based on a state-law breach of contract claim is a "core" proceeding but a breach of contract claim for which no proof of claim has been filed in the bankruptcy court is not).

[35] *See* 28 U.S.C. § 158(a) ("The district courts of the United States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title.").

pursuant to 28 U.S.C. § 1334. This matter is a core proceeding under 28 U.S.C. § 157 (b)(2)(A) and (B). [36]

Nevertheless, the MSB Owners challenge the bankruptcy court's jurisdiction, arguing that it lacked authority to act on the § 503 administrative expense request unless and until a state court had adjudicated the underlying state-law claims (over which there was no nonbankruptcy source of federal subject-matter jurisdiction). Only thereafter, the MSB Owners contend— "and only if the MSB Owners elected to pursue collection of those pre-Effective Date damages as an administrative expense—would an analysis [by the bankruptcy court] be required under Section 503 to assess whether those damages were actual and necessary costs of preserving the estate."[37] Indeed, according to the MSB Owners:

> The bankruptcy court did not acquire jurisdiction to determine the State-Law Claims simply because they had to be decided before determining the Administrative Expense Reservation, especially when a state court could have determined the State-Law Claims first. In other words, although the State-Law Claims had to "necessarily be resolved," nothing dictates that they necessarily had to be resolved by the bankruptcy court.[38]

The MSB Owners' jurisdictional challenge falls short. As numerous cases have recognized, a bankruptcy court's determinative authority encompasses underlying matters, governed by state law, that necessarily would be resolved in the process of adjudicating core matters over which the bankruptcy court has federal statutory and constitutional subject-matter

---

[36] *See* October 30 Motion, at 2. The proposed order likewise reports jurisdiction "over the motion" pursuant to 28 U.S.C. § 1334, and that the matter "is a core proceeding pursuant to 28 U.S.C. § 157(b)." *See* October 30 Proposed Order, at 1, ROA.11635.

[37] *See* Appellants' Orig. Br., at 31.

[38] *Id.* at 21–22.

jurisdiction. *See, e.g., Stern v. Marshall*, 564 U.S. 462, 499 (2011) (explaining that a bankruptcy court may constitutionally decide claims/rights that "stem[ ] from the bankruptcy itself or would necessarily be resolved in the claims allowance process"); *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450–51 (2007) (recognizing that bankruptcy courts must consult state law to determine most claims because "the basic federal rule in bankruptcy is that state law governs the substance of most claims" (cleaned up)); *Katchen v. Landry*, 382 U.S. 323, 329 (1966) (confirming that the bankruptcy court's power to allow or disallow claims includes the power to inquire into the validity of the alleged debt or obligation upon which a demand or claim against the estate is based); *In re Trendsetter HR, L.L.C.*, 949 F.3d 905, 912 (5th Cir. 2020) (confirming that the bankruptcy court properly "look[ed] to governing state law" to determine whether there [was] a cognizable bankruptcy claim" for purposes of 11 U.S.C. § 1101(5) (defining "claim") and 11 U.S.C. § 502 (governing claims allowance process)); *Morrison v. W. Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473, 479 (5th Cir. 2009) (acknowledging that proceeding to determine the non-dischargeability of a debt, a "core" proceeding, requires proof of the basis for and amount of a debt, which may require state-law determination); *cf. Northern. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 96–97 (1982) (White, J., dissenting) (emphasizing that "the bankruptcy judge is constantly enmeshed in state-law issues" because "the existence and validity of [filed] claims recurringly depend on state law").[39]

---

[39] Of course, an Article I bankruptcy court may enter final judgment—rather than submitting proposed findings of fact and conclusions of law to the Article III district court—only if it has both statutory *and* constitutional authority to do so. *Stern*, 564 U.S. at 482, 503. Thus, regardless of the statutory authorization provided by § 157(b), an Article I bankruptcy court lacks constitutional jurisdiction to summarily "hear and determine"—i.e., render a final judgment—a debtor's (or trustee's) right of recovery or relief, provided by or originating in state law, that would *not* necessarily be resolved in the

No. 24-20477

We are not convinced that a different rule applies when the bankruptcy court is presented with a request for payment of an administrative expense pursuant to § 503, rather than a filed proof of claim, pursuant to §§ 501 and 502,[40] or a complaint asserting an exception to discharge, pursuant to § 523. And the MSB Owners impart neither controlling legal authority nor a principled basis for concluding that the relief supplied by this particular Bankruptcy Code provision—§ 503(b)—requires bifurcated federal/state proceedings.[41]

---

course of deciding the proof of claim or other "core" bankruptcy matter (proceedings "arising under title 11" or "arising in") before the court. *Id.* at 487, 495–99, 503 (concluding bankruptcy court lacked constitutional authority to render final judgment on debtor's counterclaim asserting state law action, independent of the federal bankruptcy law, that would not necessarily be resolved by a ruling on a creditor's proof of claim, i.e., in the "bankruptcy process of allowing or disallowing claims"); *id.* at 495 (despite § 157(b)(2)(c)'s statutory authorization, debtor's common-law counterclaim, which simply sought to augment the bankruptcy estate, must be decided by Article III court); *Granfinanciera v. Nordberg*, 492 U.S. 33, 59 (1989) (because petitioners had not filed claims against the estate, respondent's fraudulent conveyance claims did not arise as part of allowance and disallowance of claims and required a trial by jury); *Northern Pipeline Constr. Co.*, 458 U.S. at 70 (distinguishing restructuring of debtor-creditor relations, at the core of the federal bankruptcy powers, from adjudication of state-created private rights, including debtor's right to recover contract damages); *In re Galaz*, 765 F.3d at 431 ("'[W]hen a debtor pleads an action arising only under state-law, . . . or when the debtor pleads an action that would augment the bankrupt estate, but not "necessarily be resolved in the claims allowance process [,]" then the bankruptcy court is constitutionally prohibited from entering final judgment.'" (quoting *Waldman v. Stone*, 698 F.3d 910, 919 (6th Cir. 2012) (quoting *Stern*, 564 U.S. at 499))).

[40] "Claims 'allowance' covers the approval, revision, or rejection of filed claims, and the process afforded by the Bankruptcy Rules, as effectuated in court orders." *Kipp Flores Architects, L.L.C. v. Mid-Continent Cas. Co.*, 852 F.3d 405, 410 (5th Cir. 2017) (citing *Pioneer Invest. Serv. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 389 (1993)); *id.* ("The job of the bankruptcy courts is to oversee trustees' marshalling of a debtor's assets for appropriate distribution among the creditors.").

[41] Of course some differences exist but, for purposes of the issues presently before us, we are not convinced that any are material to the instant dispute. *See, e.g., Kipp Flores Architects*, 852 F.3d at 410 ("The definition of a 'claim' in bankruptcy is extremely broad,

No. 24-20477

Likewise, the availability of permissive *abstention* does not deprive a court of *jurisdiction* that otherwise exists. Rather, the relevant statutory provision—§ 1334(c)(1)—merely confirms that the jurisdiction granted by § 1334(b) does not prevent the court's deciding, "in the interest of comity with State courts or respect for State law," to forgo exercising that jurisdiction by "abstaining from hearing a particular proceeding." *See* 28 U.S.C. § 1334(c)(1).

## B.

The MSB Owners' ripeness argument also fails. "The basic rationale behind the ripeness doctrine is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 545 (5th Cir. 2008) (cleaned up); *Monk v. Huston*, 340 F.3d 279, 282 (5th Cir. 2003) ("A court should dismiss a case for lack of ripeness when the case is abstract or hypothetical." (cleaned up)). Here, the MSB Owners' claims were neither abstract nor hypothetical, and deciding liability did not require further factual development or speculation.

The underlying events giving rise to their claims—EP's continuation of its oil-and-gas operations, after and despite the alleged termination of the Leases—were not uncertain events that *might* yield a sufficiently concrete

---

encompassing all rights to payment, of whatever nature, whether fixed, liquidated, contingent, matured, disputed, legal, equitable, or secured. *See* 11 U.S.C. § 101(5)(A)); *In re Worldcom, Inc.*, 401 B.R. 637, 643 (Bankr. S.D.N.Y. 2009) ("Under § 101(5)(A), an entity with a right to payment against the estate has a claim. The timing of when that right to payment arose . . . only affects whether the claimant must file a proof of claim or a request for an administrative expense."). Furthermore, by virtue of the debtor's having filed a bankruptcy petition, all of these proceedings trigger procedures established by federal bankruptcy law, and their final resolution is determined, to some extent, based on a source of law other than the Bankruptcy Code.

impact sometime in the future. To the contrary, both occurred before the MSB Owners filed their October 30, 2020 motion. Additionally, the determinative issues present disputed questions of law that do not require additional factual development for their resolution. *See Roark*, 522 F.3d at 544 ("A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required." (quoting *Abbott Labs*, 387 U.S. at 149)).[42] Of course, we recognize that the MSB Owners maintain that their October 30 motion (which their appellate briefs refer to as the "Administrative Expense Reservation") was "filed for preservation only due to the Bar Order," "awaited adjudication of the merits of the State-Law Claims in state court, and "rested on numerous contingent events that have not occurred here." But, in contrast to claims that *cannot* be determined unless and until another matter has been completed,[43] the MSB Owners' decision to seek *permissive* abstention in favor of a future state court proceeding,[44] after themselves having expressly

---

[42] That a complete calculation of damages—in the event of a liability determination in the MSB Owners' favor—would require an assessment of post-Effective Date, ongoing conduct does not preclude ripeness. Such circumstances are not uncommon in commercial litigation.

[43] *See, e.g., Money v. City of San Marcos*, No. 24-50187, 2025 WL 429980, at *2 (5th Cir. Feb. 7, 2025) ("[A] *regulatory* takings claim is not prudentially ripe until the plaintiff has received a final decision from the relevant government unit as to how the regulation applies to the plaintiff's property." (emphasis in original)); *Flagg v. Stryker Corp.*, 819 F.3d 132, 138 (5th Cir. 2016) (citing La. Rev. Stat. Ann. § 40:1231.8(B)(1)(a)(i) and recognizing that, under Louisiana law, a medical malpractice suit must be dismissed without prejudice if the plaintiff has not presented the claim to a medical review panel for decision prior to filing suit (internal quotation marks omitted)); *Columbia Cas. Co. v. Georgia & Fla. RailNet, Inc.*, 542 F.3d 106, 111 (5th Cir. 2008) ("[I]n general an insurer's duty to indemnify cannot be determined until after the underlying suit has been resolved." (citing *Collier v. Allstate County Mut. Ins. Co.*, 64 S.W.3d 54, 62 (Tex. App. 2001))).

[44] Whereas § 1334(c)(1) authorizes permissive abstention, § 1334(c)(2) requires abstention under certain circumstances. That provision states:

and affirmatively invoked the federal bankruptcy court's jurisdiction, did not render the otherwise justiciable proceeding unripe for determination.

Specifically, in this instance, the MSB Owners presented their administrative expense request to the bankruptcy court, on October 30, 2020, in accordance with § 503, Rule 9014 of the Federal Rules of Bankruptcy Procedure, and the Plan. They did so, moreover, with the express purpose of ensuring that the "full value" of sought-after trespass damages were "asserted for preservation and recovery if needed" as administrative expenses "entitled to administrative priority under the applicable provisions of the Bankruptcy Code [§§ 503(b)(1)(A) and 507 (a)(2)]."[45] Thereafter, despite also asserting that their trespass claims should "pass through"

_____

Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, *related to* a case under title 11 but *not* arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court *shall* abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

*See* 28 U.S.C. § 1334(c)(2) (emphasis added).

Identifying a pending state court proceeding as a requirement for § 1334(c)(2)'s application, the MSB Owners' bankruptcy and district court submissions explain that they did not seek mandatory abstention because they had not already commenced a state court action. *See In re Moore*, 739 F.3d 724, 728–29 (5th Cir. 2014) (Section 1334(c)(2) mandates abstention where "'(1) [t]he claim has no independent basis for federal jurisdiction, other than § 1334(b); (2) the claim is a non-core proceeding . . . .; (3) an action *has been commenced* in state court; and (4) the action could be adjudicated timely in state court.'" (quoting *In re TXNB Internal Case*, 483 F.3d 292, 300 (5th Cir. 2007) (emphasis added)); *In re Gober*, 100 F.3d 1195, 1206 (5th Cir. 1996) ("§ 1334(c)(2) would not require abstention because no proceeding has been commenced in state court"); *see also Southmark*, 163 F.3d at 929 n.2 (identifying "the pendency of state court litigation that can timely adjudicate the claim" as one of the statutory criteria for mandatory abstention).

[45] *See* October 30 Motion, ¶¶ 23–24, 39–47; *id.* ("Conclusion") ("request[ing] that the Court enter an order allowing the MSB Owners' administrative expense claim and granting such other relief as this Court deems just and proper").

bankruptcy[46] and seeking to have the state-law component of that claim determined by a state court, the MSB Owners *never* sought to withdraw their administrative expense request—not when the bankruptcy court failed to promptly act on their November 5, 2020 "Threshold Motion";[47] not in December 2020, when EP filed an objection to their administrative expense request; not in January 2021, when the bankruptcy courts ordered the parties to submit briefs regarding jurisdiction and abstention; not in February 2021, when that briefing was completed; not at the March 2021 hearing; and not in April and May 2021 when the parties submitted briefs regarding the viability of the MSB Owners' lease termination/trespass claims.

To the contrary, on September 17, 2021, the MSB Owners again invoked the bankruptcy court's jurisdiction, retained in § 11.1(d) of the Plan,[48] by filing an emergency motion seeking relief regarding EP's planned asset sale—"an order enforcing the confirmed Plan"—to ensure that the MSB Owners' administrative claims are paid "in full regardless of when finally allowed." *See* "MSB Owners' Emergency Motion for an Order Enforcing the Confirmed Plan to Ensure Full Payment of Administrative Claims " (hereinafter, the "Emergency Motion").[49] Indeed, the motion,

_____

[46] *Id*. ¶¶ 42, 39.

[47] Although not expressly stated as such in the November 2020 submissions, the MSB Owners' appellate briefs characterize those submissions as "requesting leave" to proceed in state court. *See* Appellants' Orig. Br. at 11–12, 19, 27, 30; Appellants' Reply Br., at 2.

[48] Section 11.1(d) of the Plan provides:

[T]he Bankruptcy Court shall retain exclusive jurisdiction . . . to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan[.]

[49] *See* Emergency Motion, at 16.

No. 24-20477

contending that the Plan would not have been confirmed absent a promise of payment in full,[50] insisted that the court "has both the jurisdiction and obligation to ensure that the Reorganized Debtors pay all allowed administrative expense claims . . . once allowed."[51]

## C.

Given this record, it seems likely that the MSB Owners proceeded in this manner in hopes of achieving what they apparently believed to be "the best of both worlds," i.e., enjoying the security and priority claim status provided by the Bankruptcy Code, § 507(a)(2), and the Plan, while also having a state court adjudicator decide whether their non-standard mineral leases terminated, under Texas law, when the lessee voluntarily ceased production for a period of approximately 40 days. But ultimately the

---

[50] *See* 11 U.S.C. § 1123(a)(5) ("Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall [] provide adequate means for the plan's implementation"); 11 U.S.C. § 1129(a)(9)(A) ("The court shall confirm a plan only if . . . the plan provides that . . . with respect to a claim of a kind specified in section 507(a)(2) . . . of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim"); *see also* Plan, § 2.1(b) ("Treatment of Administrative Claims"), which states, in pertinent part:

> On . . . the later of (a) the Effective Date and (b) the first Business Day after the date that is 30 calendar days after the date each Administrative Expense Claim becomes an Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim) *shall receive in full and final satisfaction of such Claim* . . . Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code . . . .

[51] *See* Emergency Motion, at 16 (citing Plan, § 11.1(d) and December 20, 2020 Final Decree, ¶ 7, ROA.11854). Paragraph 7 of the December 20, 2020 Final Decree provides:

> All expenses arising from the administration of the Debtors' estates and these chapter 11 cases . . . have been paid or will be paid as and when such expenses come due.

bankruptcy court declined the MSB Owners' request for permissive abstention and the district court affirmed.

And, critically, we are *not* tasked in this appeal with reviewing those decisions. The MSB Owners' appellate briefs do not identify the propriety of the bankruptcy court's and district court's denials of the MSB Owners' requests for permissive abstention, pursuant to § 1334(c)(1), as issues on appeal, and issues not raised on appeal are deemed abandoned. *See, e.g., CenturyTel of Chatham, LLC v. Sprint Commc'ns Co.*, 861 F.3d 566, 573 (5th Cir. 2017). In any event, such appellate review is unavailable. Section 1334(d) precludes appellate review of a district court's decision denying a request for *permissive* abstention pursuant to § 1334(c)(1). *See* 28 U.S.C. § 1334(d); *see also Southmark*, 163 F.3d at 929 (describing appellate jurisdiction to review order denying permissive abstention and remand as an "historical anomaly" available solely because that appellant's bankruptcy case was commenced prior to the 1994 statutory amendment).[52]

In sum, we are satisfied that neither the presence of state-law issues nor the MSB Owners' preference for a state-court adjudication of those issues deprived the bankruptcy court of jurisdiction in this matter. Likewise, neither rendered the MSB Owners' administration expense claims unripe.

---

[52] *See* 28 U.S.C. § 1334(d) (emphasis added) ("Any decision to abstain or not to abstain made under subsection (c) (other than a decision *not* to abstain in a proceeding described in subsection (c)(2)) is not reviewable by appeal or otherwise by the court of appeals."). Although appellate review by a court of appeals remains available for "a decision not to abstain in a proceeding described in [§ 1334](c)(2))," the MSB Owners, as noted, never moved for *mandatory* abstention pursuant to § 1334(c)(2).

IV.

Shifting our focus to the merits, we must determine whether the bankruptcy and district courts correctly concluded that EP's 40-day cessation of production, in May/June 2020, did *not* cause the Leases to terminate. In arriving at that conclusion, both courts rejected the MSB Owners' assertions that, despite EP's resumption of production, EP's failing to also "commence [and then continue] drilling or reworking operations," within 120 days of ceasing production in May 2020, caused the Leases to automatically terminate. We likewise reject the MSB Owners' position and conclude that the Leases did not terminate.

A.

The MSB Owners' automatic termination argument is based on language in "Paragraph XI(d)" of the Lease. Paragraph XI—entitled "Termination and Release"—provides: [53]

## XI. <u>Termination and Release</u>

**(a) Termination**. If this lease has not otherwise terminated as herein elsewhere provided, then upon the expiration of the primary term[54] or upon the cessation of continuous drilling operations conducted in accordance with *Paragraph VIII* [entitled "Continuous Development],[55] whichever occurs later, this lease shall then terminate as to all lands covered hereby except land within a production unit or units at that time. In addition, this lease shall then terminate with respect to

---

[53] *See* Lease, Paragraph XI–Termination and Release, at 31–33. Underlining, bracketed ordinal numbers and words, and inter-paragraph spacing between sentences have been added for emphasis and/or convenience.

[54] *See* Lease, Paragraph III–Primary Term, at 6; Lease, Paragraph V(b)–Delay Rentals, at 22–23 (regarding production on the leased premises during the primary term).

[55] *See* Lease, Paragraph VIII–Continuous Development, at 28–29.

No. 24-20477

[the deep rights] below . . . in each such production unit at the time of such termination.[56]

**(b) Release of Leased Premises and Assignment of Rights in Geophysical Information.**

Within sixty (60) days after any partial termination of this lease as provided in this *Paragraph XI*, lessee shall deliver to lessor a plat showing the production unit designated by lessee for wells then producing oil or gas, and a release properly describing . . . the acreage released. In the same manner, lessee shall release this lease when it has terminated in its entirety. . . . [57]

**(c) Easements Retained Over Lands Released.**

Although this lease may have terminated in part and have been partially released, it is agreed that lessee shall have and retain such easements over and across such terminated portion or portions of the land originally covered by these lease as shall be reasonably necessary for ingress and egress and to enable lessee to produce, develop, operate and transport oil or gas from the portion or portions of the lease continuing in effect.

---

[56] Paragraph IX of the Lease—entitled "IX. Production Units (Density)"— states, in pertinent part:

A "production unit" shall be the unit designated by lessee attributable to a well on the leased premises producing oil or gas, as follows:

(a) Each producing oil well shall hold this lease in force as to not more than (i) forty acres for all vertical wells . . . and shall be that acreage designated by lessee as the acres to be attributed to such well by instrument filed for record in the Office of the County Clerk, LaSalle County, Texas, within sixty (60) days after the expiration of the primary term. . . .

*See* Lease, Paragraph IX, at 29.

[57] The remainder of this paragraph has been omitted.

No. 24-20477

**(d) Subsequent Operations.**

[1] [Lease-Maintenance Provision] After the occurrence of any event described in *subparagraph (a)* of this *Paragraph XI*, production from or operations conducted on each production unit shall maintain this lease in force as to, but only as to, that portion of the leased premises included within such production unit, and production from or operations on one unit will not maintain this lease as to any other production unit.

[2] [Temporary-Cessation Provision] If production should cease from any production unit, this lease shall terminate as to all lands and depths included within such unit unless lessee commences drilling or reworking operations on such unit within one hundred twenty (120) consecutive days thereafter and pursues such operations with diligence on the same or successive wells with no cessation of operations more than one hundred twenty (120) consecutive days; and if production is restored from such unit, this lease shall remain in effect as to the lands and depths included therein as long as oil or gas is produced from such unit, subject to the remaining provisions of this lease.

[3] [New-Production-Unit Provision] If the well or wells drilled or reworked by lessee on such unit are completed and produce from a different zone or zones than the well original[ly] completed on such unit necessitating a change in the size of the unit, or if a well formerly classified as a gas well is for any reason reclassified as an oil well, then such new, recomputed or reclassified well or wells shall maintain this lease in force only as to the new production unit, and lessee shall, within one hundred twenty (120) consecutive days after the completion of its drilling or reworking operations on such production unit, release all land within the previous unit outside the new unit; provided, however, that lessee may maintain this lease as the lands outside the new production unit but within the former production unit by commencing drilling operations thereon

within one hundred twenty (120) consecutive days and by pursuing such operations with due diligence on the same or successive wells with no cessation of operations more than [120] consecutive days; but upon cessation of such operations, this lease shall terminate as to all lands formerly encompassed by such production unit, except as to new production units assigned to wells then producing oil or gas and designated by lessee in accordance with the requirements of *Paragraph IX* above.

[4] [Permanent-Cessation Provision] Any cessation or absence of drilling or reworking operations or production on or from a production unit which continues for a period of one hundred twenty (120) consecutive days or more shall be deemed for all purposes of this lease to be permanent and not temporary.

Paragraph XI(d) itself is entitled "Subsequent Operations" but, in the interest of clarity and convenience, we have assigned names, which appear above in brackets, to each of its four sentences. We refer to its first sentence as "the lease-maintenance provision"; its second sentence as "the temporary-cessation provision"; its third sentence as "the new-production-unit provision"; and its fourth/last sentence as "the permanent-cessation provision." The parties agree that Paragraph XI(d)'s temporary-cessation provision applies here and that EP resumed production within 40 days—i.e., far less than 120 days—of cessation. They disagree, however, regarding the significance of that resumption of production vis-à-vis the lifespan of the Leases.

The MSB Owners argue EP's resumption of production is entirely irrelevant because, they contend, Paragraph XI(d)'s temporary-cessation provision still required EP to commence (and diligently pursue) drilling or reworking operations, within 120 days of the production cessation, in order to maintain the Leases. The MSB Owners additionally argue that the

restoration of production addressed in the temporary-cessation provision's second clause—"and if production is restored . . . this lease shall remain in effect"—contemplates *only* production obtained *as a result of* the required timely commenced, newly undertaken "drilling or reworking operations."[58] In other words, they maintain that, after voluntarily ceasing production, EP's essentially "flipping a switch" to "turn[] [existing wells] back on" was not enough to prevent the Leases' termination.[59]

To support their position, the MSB Owners emphasize the temporary-cessation provision's "shall terminate . . . unless" language, characterizing it as establishing a "special limitation," rather than an "optional savings clause," that, under Texas law, "will actively cause the lease to terminate 'unless' [EP] strictly complies with the lease terms." *See* Appellants' Orig. Br., at 37; *id.* at 39 ("Compliance with special limitations must be "literal,' and economic difficulties provide no excuse."). And here, the MSB Owners argue, the relevant lease terms with which EP was required to strictly comply were "timely commencing [within 120 days from cessation of production] drilling or reworking operations and continuing those operations without delay."

## B.

Both the bankruptcy and district courts rejected the MSB Owners' lease-termination argument, concluding that EP had satisfied Paragraph XI(d)'s requirements by resuming production within approximately 40 days. The bankruptcy court reasoned that, under the Leases' *habendum* clause—in Paragraph III—EP would retain each lease "so long . . . as oil or gas [was] produced," *or* the lease was "maintained in force and effect under other

---

[58] *See* Appellants' Reply Br., at 28.

[59] *Id.* at 1.

terms and provisions,"[60] and that restoring production within the temporary-cessation provision's 120-day time period was sufficient to maintain the lease.[61] Finally, it read the "and if production is restored" clause to "identif[y] the event that will hold the lease in force—the restoration of production."[62]

Affirming the bankruptcy court's merits determination, the district court decided that the bankruptcy court had correctly harmonized both parts of the temporary-cessation provision. Regarding the provision's "and if production is restored" clause, the district court reasoned that "Texas courts also observe that, when two clauses are separated by a semicolon and the word 'and,' the application of 'basic grammar rules' indicates that 'each clause stands alone.'" The district court concluded: "The semicolon with the word 'and' is thus best taken to mean 'also,' with the following clause providing an *additional* method of maintaining the lease."[63]

Lastly, the district court explained, "[]the reading given by the Bankruptcy Court also harmonizes with [Paragraph XI(d)'s last sentence]"—"the permanent-cessation provision"—providing, in pertinent part:

> Any cessation or absence of drilling *or* reworking operations *or* production on or from a production unit which continues for a period of one hundred twenty (120) consecutive days or more

---

[61] *See* Bankr. Ct. Op., at 40–43, *In re EP Energy E&P Co.,* No. 19-35647, 2021 WL 5917771, at *20–22.

[62] *Id.* at 40–41; *In re EP Energy E&P Co.,* No. 19-35647, 2021 WL 5917771, at *20.

[63] *See* Dist. Ct. Op., at 25; 752 F.Supp.3d at 667–68.

> shall be deemed for all purposes of this lease to be permanent and not temporary. [64]

This sentence clarifies, the district court concluded, that "if 'reworking operations *or* production' begin within 120 days, the cessation is only temporary, and the lease remains in effect. The leases can be maintained through either of these means."[65]

On appeal, the MSB Owners argue that the district court—by holding that EP could maintain the leases simply by restarting production, without also commencing drilling or reworking operations within 120 days of the cessation of production—"rewrites the Lease terms to impermissibly add a third alternative"—resuming production—"that the parties did not include."[66] They also argue that "the lower courts' interpretation impermissibly transforms the conjunctive 'and' into the disjunctive 'or,'" thereby "obviating the requirement for drilling or reworking operations."[67]

---

[64] *See* Lease, Paragraph XI(d)–Subsequent Operations, at 33 (emphasis added).

[65] *See* Dist. Ct. Op., at 26; 752 F.Supp.3d at 668.

[66] *See* Appellants' Orig. Br., at 42 (quoting *Sundown Energy Ltd. P'ship v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 890 (Tex. 2021) (courts "may not rewrite the parties' contract nor add to its language")).

[67] *Id.* at 42–43. The MSB Owners additionally challenge the bankruptcy court's and district court's determinations that EP's continuous development on acreage outside of existing production units, in accordance with the provisions of Paragraph VIII–Continuous Development, was sufficient to maintain nine of the sixteen leases at issue, i.e., those Leases that were not being maintained solely by continued production. This issue primarily turns on the proper interpretation of Paragraph XI(d)'s "after any event" language. But, given our determination that the temporary cessation of production that occurred here did not automatically terminate any of the sixteen Leases, we need not, and do not, decide this issue.

No. 24-20477

## C.

Resolution of this aspect of the MSB Owners' appeal requires that we ascertain the proper construction of applicable provisions of the Leases. Under Texas law, the general principles governing the construction of contracts generally also govern a court's construction of mineral leases. *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 595 (Tex. 2018) ("*Discovery Operating*").[68] The terms of the lease define the parties' respective rights and duties thereunder. *Id.*[69]   Accordingly, "our objective . . . is "to ascertain the parties' intent as expressed within the lease's four corners." *Id.* (quoting *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002)). We must "'examine the entire lease and attempt to harmonize all its parts, even if different parts appear contradictory or inconsistent,' because the parties are presumed to have 'intended every clause to have some effect.'" *Discovery Operating*, 554 S.W.3d at 595 (quoting *Anadarko*, 94 S.W.3d at 554).

Our "most important consideration . . . is the agreement's plain, grammatical language." *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615

---

[68] "When adjudicating claims for which state law provides the rules of decision, we are bound to apply the law as interpreted by the [relevant] state's highest court." *Barfield v. Madison Cnty., Miss.*, 212 F.3d 269, 271–72 (5th Cir. 2000) (citing *Transcontinental Gas v. Transp. Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992)). "Intermediate state courts of appeals' decisions can be persuasive, but are not controlling." *Harken Expl. Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 n.3 (5th Cir. 2001); *In re Canada*, No. 25-10548, 2026 WL 376475, at *2 (5th Cir. Feb. 11, 2026) (deciding to certify question to state's highest court where *Erie* guess otherwise was required).

[69] As with contracts generally, the parties are free to decide their contract's terms, and the law's "strong public policy favoring freedom of contract" compels courts to "respect and enforce" the terms on which the parties have agreed. *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016); *Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 95 (Tex. 2011) ("As a fundamental matter, Texas law recognizes and protects a broad freedom of contract.").

S.W.3d 144, 148 (Tex. 2020) ("*Endeavor Energy*") (citing *Anadarko*, 94 S.W.3d at 554 ("We give the lease's language its plain, grammatical meaning unless doing so would clearly defeat the parties' intentions.")). "[Our] task 'is to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean.'" *Id.* (quoting *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 764 (Tex. 2018)).

"At the same time, [we are mindful that] the objective meaning words convey often depends upon the 'objectively determinable facts and circumstances' that would influence how a reasonable reader would understand the language." *Endeavor Energy*, 615 S.W.3d at 148 (quoting *URI*, 543 S.W.3d at 757–58). Accordingly, contracts are read "'from a utilitarian standpoint bearing in mind the particular business activity sought to be served,' and avoiding unreasonable constructions when possible and proper." *Id.* (quoting *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015)).[70] "To that end, when contractual text alone is inconclusive, courts may consider the facts and circumstances surrounding the contract, including the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give context to the parties' transaction." *Endeavor Energy*, 615 S.W.3d at 148 (internal quotation marks omitted).

"If, even after applying all 'pertinent construction principles,' a contract's language remains susceptible 'to two or more reasonable interpretations,' then the agreement is ambiguous as a matter of law." *Id.*

---

[70] *See also Garcia v. King*, 164 S.W.2d 509, 512 (Tex. 1942) ("[T]o understand and properly interpret the language used by the parties, [the court] must consider the objects and purposes intended to be accomplished by them in entering into the contract.").

(quoting *Plains Expl. & Prod. Co.*, 473 S.W.3d at 305).[71] "In most instances, an ambiguous contract's meaning must be determined by a finder of fact, who may consider evidence of the parties' subjective intent." *Id.* (citing *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex. 1996)). However, "[b]ecause oil and gas leases 'transfer and affect title to real-property interests . . ., they are subject to special construction rules that apply particularly to agreements governing property rights.'" *Id.* (quoting *Discovery Operating*, 554 S.W.3d at 595).

One such rule applies to "special limitations,"[72] which are contractual terms that "'provide[] that the lease will automatically terminate upon the

_____

[71] "The ultimate goal, however, is always to determine the parties' intent as objectively expressed in the words of their agreement." *Endeavor Energy*, 615 S.W.3d at 148. Thus, "[]though consideration of surrounding circumstances is sometimes helpful in understanding the words chosen by the parties, such extrinsic evidence cannot justify interpreting contractual 'language [to] say what it unambiguously does not say.'" *Id.* (quoting *First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017)); *see also Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 728 (Tex. 1981) ("The courts will enforce an unambiguous instrument as written; and, in the ordinary case, the writing alone will be deemed to express the intention of the parties.").

[72] Under Texas law, "[a] mineral lease grants a fee simple determinable to the lessee." *BP Am. Prod. Co. v. Red Deer Res., LLC*, 526 S.W.3d 389, 394 (Tex. 2017) (citing *Anadarko*, 94 S.W.3d at 554 (citing *Tex. Co. v. Davis*, 113 Tex. 321, 254 S.W. 304, 309 (1923))). "As a result, 'the lessee's mineral estate may continue indefinitely, as long as the lessee uses the land for its intended purpose.'" *Id.* (quoting *Anadarko*, 94 S.W.3d at 554). "However, if the event upon which the mineral estate is limited occurs, then the lessee's mineral estate terminates automatically." *Id.* (quoting *Anadarko*, 94 S.W.3d at 554). *See Discovery Operating*, 554 S.W.3d at 606 n.14 (contrasting forfeitures "which generally arise from the failure to comply with a condition subsequent, [and] cut short the natural limit of the leasehold interest," with special limitations, which "do[] not operate to cut short the estate but simply fix[] one of the natural limits of the estate beyond which the estate cannot endure, being similar in this respect to a general limitation, and, like a clause of general limitation, [are] in no proper sense [] forfeiture provision[s]'") (quoting A.W. Walker, Jr., *The Nature of the Property Interests Created by an Oil and Gas Lease in Texas*, 8 Tex. L. Rev. 483, 486 (1930)); *PPC Acquisition Co., LLC v. Delaware Basin Res., LLC*, 619 S.W.3d 338, 349–50 (Tex. App. 2021) (distinguishing special limitations

No. 24-20477

happening of a stipulated event.'" *Id.* at 148 n.1 (quoting *Discovery Operating*, 554 S.W.3d at 606).[73]

"Although whether a lease has terminated is always a question of resolving the intention of the parties from the entire instrument" a special limitation will not be found "unless the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning." *Id.* at 149 (quoting *Discovery Operating*, 554 S.W.3d at 606) (internal quotation marks omitted)).[74] Accordingly, "contractual language will not be held to automatically terminate the leasehold estate unless that 'language . . . can be given no other reasonable construction than one [yielding that] result.'" *Id.* (quoting *Knight v. Chicago Corp.*, 188 S.W.2d 564, 566 (1945)).[75]

---

causing oil and gas leases to automatically terminate and breaches of covenants entitling a party to recover damages or obtain specific performance); *Blackmon v. XTO Energy*, 276 S.W.3d 600, 605 (Tex. App. 2008) (discussing general and special limitations, conditions subsequent, and covenants vis-à-vis oil and gas leases); 3 Patrick H. Martin and Bruce M. Kramer, Howard R. Williams & Meyers, Oil and Gas Law (hereinafter, "Williams & Meyers"), § 606 (LexisNexis Matthew Bender 2024) (distinguishing between an "unless" clause—construed as a clause of special limitation requiring no affirmative act on the part of a lessee who wants to terminate the lease because termination is automatic—and an "or" clause—construed as a clause of condition requiring an affirmative act to terminate the lease before its expiration).

[73] "Th[e] [stipulated] event may be the cessation of production in contravention of the lease's terms, failure to commence drilling or reworking operations within the time the lease required, or an operator's failure to timely pay a shut-in royalty the lease required." *Discovery Operating*, 554 S.W.3d at 606 & nn.15–17 (citing *Freeman v. Magnolia Petroleum Co.*, 171 S.W.2d 339, 342 (Tex. 1943), and *Samano v. Sun Oil Co.*, 621 S.W.2d 580, 583–85 (Tex. 1981)).

[74] In other words, though courts are to "resolve questions of contractual meaning based on objective textual indicators of the parties' intent, if at all possible . . .[,] when all available means of interpreting the lease are exhausted and the disputed provision remains equally susceptible to multiple reasonable readings, the ambiguity [must] be resolved against imposition of a special limitation." *Endeavor Energy*, 615 S.W.3d at 149.

[75] In *Discovery Operating*, the Supreme Court of Texas decided that a retained-acreage clause providing that "the leases 'shall automatically terminate as to all acreage

33

No. 24-20477

D.

Applying the foregoing principles, we are not convinced that the Leases' terms dictated that EP's 40-day market-based cessation of production would cause the Leases to automatically terminate—despite the interim resumption of production from fully-functional *existing* wells— unless EP *also* began (and thereafter diligently pursued) *new* drilling or reworking operations within 120 days from the initial cessation date.

A number of factors lead to this conclusion. To start, Paragraph XI(d)'s lease-maintenance provision—which immediately precedes the temporary-cessation provision—states, in significant part: "the production from *or* operations conducted on each production unit shall maintain this lease in force . . . ." Notably, this provision requires ongoing production *or* operations to maintain the lease; it unquestionably does *not* require both.[76]

Anchored by that premise, the second and fourth sentences of Paragraph XI (d)—the temporary-cessation and permanent-cessation provisions—collectively address cessations of production and cessations of operations. Focusing on the plain, grammatical language of the provisions, viewed in the context of the particular purposes to be served by these mineral leases, we deduce that . . . "an ordinary person using th[e]se words under the circumstances in which they are used would understand them to mean" that, subject to the remaining provisions of the lease:

---

not assigned to those proration units . . .'" is "precisely the type of clear and unequivocal language that imposes a special limitation on a lease and will cause the lease to terminate under its own terms." 554 S.W.3d at 606.

[76] According to Paragraph IX of the Leases, a "production unit" is "the unit [acreage] designated by lessee attributable to *a well* on the leased premises producing oil or gas." *See* Lease, Paragraph IX–Production Units (Density), at 29.

(1) If <u>production ceases</u> but drilling or reworking operations are timely commenced (within 120 consecutive days), and pursued with diligence with no cessation of operations lasting more than 120 consecutive days, those continuous operations will maintain the lease;

(2) If <u>production ceases but then is restored</u> as a result of timely commenced drilling or reworking operations, the lease "shall remain in effect . . . as long as oil or gas is produced from such unit";

(3) If <u>production ceases</u> for a period of 120 consecutive days and, during that time, the lessee does *not* commence drilling or reworking operations, the cessation of production will be deemed permanent, rather than temporary, and the lease shall terminate as to the lands and depths included within the affected production unit at the end of that 120-day period; and

(4) If <u>production ceases but then is restored</u> without drilling or reworking operations—within 120 consecutive days of cessation—the lease "shall remain in effect . . . as long as oil or gas is produced from such unit."

This construction of Paragraph XI(d)'s provisions comports with Texas jurisprudence, and thus parties' reasonable expectations, regarding the automatic termination provisions in oil and gas mineral leases governed by Texas law. Texas courts have long recognized that the production required to maintain a mineral lease in its secondary term does not necessitate non-stop production without interruption of any kind. That is to say, whereas a *permanent* cessation of production will automatically terminate a lease that lasts only "as long as oil or gas is produced," a *temporary* cessation will not. *See Ridge Oil Co., Inc. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 150–51 (Tex. 2004) ("[O]nly permanent cessation of production may cause the estate to terminate."); *Anadarko*, 94 S.W.3d at 554 ("[A] typical Texas lease. . . automatically terminates if actual production *permanently* ceases during the secondary term.") (emphasis added); *Sutton v. SM Energy Co.*, 421 S.W.3d

153, 158 (Tex. App. 2013) ("A lease . . . automatically terminates if actual production during the secondary term ceases *other than temporarily*." (emphasis added)).[77]

Furthermore, the temporary cessation of production doctrine is *not* limited to "sudden stoppage of the well or some mechanical breakdown of the equipment used in connection therewith, or the like." *Ridge Oil Co.*, 148 S.W.3d at 152; *see also Krabbe v. Anadarko Petroleum Corp.*, 46 S.W.3d 308, 319 (Tex. App. 2001) (rejecting assertion that the doctrine is limited to "physical or mechanical causes"). Nor is the doctrine limited to unforeseeable and unavoidable causes. *Ridge Oil Co.*, 148 S.W.3d at 152 (reasoning that findings regarding "foreseeability and avoidability" were not necessary because they "are not essential elements of the temporary cessation of production doctrine." (quoting court of appeals' decision)); *Guinn Invs., Inc. v. Ridge Oil Co.*, 73 S.W.3d 523, 532 (Tex. App. 2002) (confirming that the temporary cessation of production doctrine can apply to *voluntary* cessations), *rev'd on other grounds sub nom. Ridge Oil Co.*, 148 S.W.3d 143 (Tex. 2004).

The maximum duration of a temporary (non-permanent) cessation of production depends on the terms of the lease. Texas common law establishes

---

[77] *See also Krabbe v. Anadarko Petroleum Corp.*, 46 S.W.3d 308, 315 (Tex. App. 2001) (explaining that "the automatic termination rule is relaxed if the lessee can prove that the cessation of production is temporary"); *Sun Operating Ltd. P'ship v. Holt*, 984 S.W.2d 277, 281–82 (Tex. App. 1998) ("[I]mplied within an oil and gas lease is the provision that temporary interruptions in production of commercial quantities will not cause the lease to terminate." (citing *Midwest Oil Corp. v. Winsauer*, 323 S.W.2d 944, 946 (Tex. 1959)); 2 Eugene O. Kuntz, A Treatise on the Law of Oil & Gas § 26.13 (1989 ed.) ("The doctrine of temporary cessation of production is a practical necessity, because oil and gas are never produced and marketed in a continuous, uninterrupted operation that goes on every hour of the day and night.").

an implied term, i.e., that "a lease will continue for a *reasonable* period of time, . . . to give the lessee an opportunity to resume production." *Red River Res., Inc. v. Wickford, Inc.*, 443 B.R. 74, 81 (Bankr. E.D. Tex. 2010) (citing *Watson v. Rochmill*, 155 S.W.2d 783, 784 (Tex. 1941)); *Krabbe*, 46 S.W.3d at 315 ("The lessee is entitled to a reasonable time" in which to remedy the cause of the temporary cessation and resume production."). And "[w]hat constitutes a reasonable time in which to regain production depends on the facts of each case." Williams & Meyers, *supra* note 72, § 604.4; *see also Krabbe*, 46 S.W.3d at 315 (recognizing that "reasonable time" depends on the facts of the case).

But if, like here, the lease at issue expressly defines the relevant time period constituting a temporary cessation of production—typically by expressing a time period during which drilling or reworking operations must be conducted in order to prevent the lease's termination—the time period stipulated in the lease controls. *See, e.g.*, *BP America Prod. Co., v. Red Deer Resources, LLC*, 426 S.W.3d 389, 395–96 (Tex. 2017) (requiring proof of a cessation longer than the 90 days permitted in the lease's cessation-of-production savings clause); *Sun Operating Ltd. P'ship v. Holt*, 984 S.W.2d 277, 282 (Tex. App. 1998) ("[B]ecause the lease at bar expressed a time [60 days] within which drilling and reworking had to be initiated once production ended, the implied temporary cessation rule invoked by the Sun Parties does not apply."); *Samano v. Sun Oil Co.*, 621 S.W.2d 580, 583–85 (Tex. 1981) (reasoning that the sixty-day provision "afford[ed] a known time for commencing [the] drilling or reworking operations" required to prevent the lease's termination"); *Woodson Oil Co. v. Pruett*, 281 S.W.2d 159, 164 (Tex. Civ. App. 1955), *writ ref'd n.r.e.* (Rule entitling the lessee to a reasonable time to "remedy the defect and resume production" did not apply to lease in

which "the parties [had] agreed and stipulated what would constitute temporary cessation.").[78]

Where the lease contains such express language, a cessation results in termination where "there has been a cessation of production for a period *in excess of* that allowed under the lease." *See* WILLIAMS & MEYERS, *supra* note 72, § 604.4; *see also, e.g.*, *Red Deer*, 426 S.W.3d at 396 (reasoning that lease termination under a cessation-of-production clause requires a total cessation of physical production for a period of time longer than that permitted in the lease's cessation-of-production clause); *Sun Operating*, 984 S.W.2d at 282 (Where production ceases, even though wells are capable of production, and clause requires commencing "drilling or re-working operations . . . with no cessation of more than sixty consecutive days until production results[,]" the "lessee still has 60 days to remedy the situation which caused production to stop *or* [to] initiate drilling *or* reworking operations even though the other wells are capable of production[.]" (emphasis added)); *Mayers v. Sanchez-O'Brien Mins. Corp.*, 670 S.W.2d 704, 709 (Tex. App. 1984), *writ ref'd n.r.e.* (Nov. 14, 1984) (Where cessation of production clause provided that, if production should cease, "this lease shall not terminate if Lessee commences operations for drilling or reworking within sixty (60) days thereafter," Lessee had an additional sixty days (60) from date of cessation in which to commence actual production, *or* to rework or commence additional drilling, in order to avoid lease termination.); *Wainwright v. Wainwright*, 359 S.W.2d 628, 629 (Tex. Civ. App.—Fort Worth 1962, *writ ref'd n.r.e.)* (construing provision conditioning lease's continued existence on lessee's resumption of drilling operations within 90 days from the cessation to mean that "the lease terminated if production was

---

[78] *See also* WILLIAMS & MEYERS, *supra* note 72, § 604.4, § 616.2.

*voluntarily* discontinued by [lessee] for more than 90 days" (emphasis added)); *Woodson Oil Co. v. Pruett*, 281 S.W.2d 159, 164 (Tex. Civ. App. 1955), *writ ref'd n.r.e.* (construing lease provision requiring re-working or drilling operations within sixty days to mean that "cessation of production [] for more than sixty consecutive days is not to be regarded as temporary such that, if re-working or additional operations were not begun within the sixty-day period, the lease terminates by its own provisions).

Here, both the temporary-cessation and permanent-cessation provisions establish 120-day time periods and EP resumed production within 40 days. Even so, the MSB Owners insist that their temporary-cessation provision is a clause "uniquely tailored to pertain to a cessation . . . remedied [only] by drilling or reworking operations"; that "the parties carefully bargained for these terms"; and that "strict compliance" was required.[79] The MSB Owners' argument is unavailing. The temporary-cessation provision here is not materially different from the one at issue in *Sun Operating*, which, the court reasoned, "deals with prolonging the viability of the lease once production stops, *not* with the reasons why production stopped." 984 S.W.2d at 282 (emphasis added).

Also, insofar that the MSB Owners argue that the temporary-cessation provision's second clause, addressing restoration of production, contemplates *only* production obtained *as a result* of newly commenced "drilling or reworking operations," they attribute far too much significance to the mere presence of a semi-colon followed by the word "and." The instant provision also lacks any of the arguably causative language found in some clauses. *See, e.g.*, *Prize Energy Res., L.P. v. Cliff Hoskins, Inc.,* 345 S.W.3d 537, 552–53 (Tex. App. 2011) ("if they [drilling operations] result in

---

[79] *See* Appellants' Orig. Br., at 46.

production of oil, gas, or other mineral"), *abrogated in part in other grounds by Nath v. Texas Children's Hosp.*, 576 S.W.3d 707 (Tex. 2019); *Wainright*, 359 S.W.2d at 629 ("if they [drilling operations] result in production of oil or gas"); *Anadarko*, 94 S.W.3d at 553 ("if production results therefrom").

Additionally, adopting the MSB Owners' proposed construction would mean that *any* temporary interruption of production from an existing, fully-functional well—regardless of its brevity and/or rationale—would require that EP automatically undertake and continue (with no cessation of more than 120 consecutive days) costly and unnecessary drilling or reworking operations for the sole purpose of avoiding automatic termination of the Leases.[80] Such a wasteful expenditure of resources is contrary to industry norms (as reflected in the above-referenced jurisprudence) and the parties' contractual objectives, i.e., mutually profitable production and reasonable development (utilizing a "reasonably prudent operator" standard) of the leased premises for the production of oil or gas. [81] *See, e.g., Garcia v. King,* 164 S.W.2d 509, 512 (Tex. 1942) ("The object of the contract was to secure development of the property for the mutual benefit of the parties."); *id.* at 511 ("[T]he very purpose of the landowner in executing the lease is to have

---

[80] Regarding the definition of "*drilling*," the Lease states: "[T]he actual drilling of a well shall be deemed to have commenced when a derrick, a rig and machinery capable of drilling to a depth sufficient to test a prospective or potential oil or gas horizon have been erected, and when such well has been spudded in and is rotating under power." "*Reworking operations*" are defined as "actual work in the hole of a well, in a good and workmanlike manner, prosecuted with reasonable diligence, in an attempt to recomplete or repair said well to return it to production." *See* Lease, Paragraph I(e) and (u)–Definitions, at 2, 4–5.

[81] *See* Lease, Paragraph VIII–Continuous Development, Paragraph IX–Production Units, and Paragraph XI–Termination and Release, at 28–34 (Lease provisions addressing continuous development, production units, and quantity of wells to be drilled); Lease, Paragraph IV–Royalties, at 7–17 (provisions regarding royalties and market pricing); Lease, Paragraph IV(e), at 17 (establishing 25% royalty).

the oil and gas on the leased premises produced and marketed so that he may receive his royalty therefrom, and the purpose of the lessee is to discover and produce oil and gas in such quantities as will yield him a profit," and "are material elements to be considered in the interpretation of the contract."). Indeed, EP maintains that, in this instance, its "prudent decision to pause production because of unprecedented external market forces" benefitted the MSB Owners by yielding "increased royalty revenues."[82]

At a minimum, moreover, the MSB Owners' proposed construction of the instant temporary-cessation provision foments pointless uncertainty regarding a matter for which Texas law has long "promoted greater certainty," that is, "the continued existence of a lease." *See Anadarko*, 94 S.W. 3d at 560 (explaining that a breach of the implied covenant to reasonably develop the premises does not automatically terminate a lease because neither lessee nor lessor could clearly or certainly know "whether the estate granted was alive or ended").

We likewise are not persuaded by the MSB Owners' contention that the "[bankruptcy court's and] district court's interpretation[s] would allow EPLP to voluntarily cease production and then momentarily turn wells back on every 119 days with impunity."[83] As EP points out, the production required to maintain the Leases is "production in paying quantities measured over an 18-month period," and "it is unlikely that one day of production every 120 days would [satisfy that requirement]."[84] Additionally, even if such conduct would not automatically terminate the lease, other remedies

_____

[82] *See* Appellee's Br., at 57.

[83] *See* Appellants' Orig. Br., at 49.

[84] *See* Lease, Paragraph I(q)–Definitions, at 4.

exist for breaches of the "reasonably prudent operator" standard, including a claim for money damages. *See, e.g.*, *Anadarko*, 94 S.W.3d at 560.

Based on the foregoing, we are convinced that, if production ceases, the Leases' temporary-cessation provision, properly construed, supplies two alternative ways to maintain the lease: (1) timely restoration of production, *or* (2) if production has not been restored, by commencing drilling or reworking operations within 120 days of cessation. Of course, as the MSB Owners emphasize, the parties to a contract may agree to more extensive rights and obligations than are "typical" in a particular industry. *See, e.g.*, *Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 220 (Tex. 2022) ("Parties are free to draft novel contractual terms that produce results some may consider odd."). And if the MSB Owners had wanted to avoid the result we reach here, its potential and hardly unforeseeable occurrence could and should have been clearly addressed during the course of its self-proclaimed "careful bargaining" by means of sufficiently tailored contractual terms. But, as noted, under Texas law, contractual provisions will not be "held to automatically terminate [a] leasehold estate" unless the language is "so clear, precise, and unequivocal" that it "can be given no other reasonable construction." Certainly, the MSB Owners' proffered construction does not meet this standard.[85]

The interpretation proffered by the MSB Owners—one that would fundamentally expand the scope of EP's performance obligations to require unnecessary and costly drilling or reworking operations any time that the lessee's business judgment counseled in favor of a cessation of production

---

[85] This standard recognizes that "[s]o far as [a lessee is] concerned, the object in providing for a continuation of the lease for an indefinite time after the expiration of the primary period [is] to allow [them] to reap the full fruits of the investments made by them in developing the property." *Garcia*, 164 S.W.2d at 513.

regardless of its brevity and/or financial prudence—requires much more clarity than that set forth in the Lease's language. Indeed, the incongruity of the MSB Owners' proffered construction is readily apparent when that provision is considered in light of the specificity and detail utilized in other provisions of the contract, including the "new-production-unit provision" in Paragraph XI(d)'s next/third sentence.

In sum, based on our de novo review of the instant record, applicable law, and the parties' submissions, we agree that EP's failing to "commence drilling or reworking operations" within 120 days of ceasing production (for a period of 40 days because of Spring 2020's unfavorable market conditions) did not cause the Leases to automatically terminate. Otherwise, EP would be required to conduct perfunctory, useless operations that "would be of no benefit to either party" in order to avoid losing the lease. *Garcia*, 164 S.W.2d at 511. If that was the parties' intended result, it was not sufficiently expressed in their contract. Texas law requires more certainty.

## V.

In this appeal, the MSB Owners challenge the bankruptcy court's assessments of jurisdiction and the proper application of Texas substantive law governing the construction of oil and gas leases. For the reasons stated herein, we AFFIRM.